Summary
4/30/2018 2:28:14 PM

Differences exist between documents.

**New Document:**        **Old Document:**
16-499_new               16-499
91 pages (485 KB)        91 pages (466 KB)
4/30/2018 2:28:04 PM     4/30/2018 2:28:04 PM
Used to display results.

Get started: first change is on page 15.

No pages were deleted

**How to read this report**

Highlight indicates a change.
Deleted indicates deleted content.
▲ indicates pages were changed.
⬌ indicates pages were moved.

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## JESNER ET AL. *v.* ARAB BANK, PLC

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 16–499.   Argued October 11, 2017—Decided April 24, 2018

Petitioners filed suits under the Alien Tort Statute (ATS), alleging that they, or the persons on whose behalf they assert claims, were injured or killed by terrorist acts committed abroad, and that those acts were in part caused or facilitated by respondent Arab Bank, PLC, a Jordanian financial institution with a branch in New York. They seek to impose liability on the bank for the conduct of its human agents, including high-ranking bank officials. They claim that the bank used its New York branch to clear dollar-denominated transactions that benefited terrorists through the Clearing House Interbank Payments System (CHIPS) and to launder money for a Texas-based charity allegedly affiliated with Hamas. While the litigation was pending, this Court held, in *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. 108, that the ATS does not extend to suits against foreign corporations when "all the relevant conduct took place outside the United States," *id.,* at 124, but it left unresolved the Second Circuit's broader holding in its *Kiobel* decision: that foreign corporations may not be sued under the ATS. Deeming that broader holding binding precedent, the District Court dismissed petitioners' ATS claims and the Second Circuit affirmed.

*Held*: The judgment is affirmed.

808 F. 3d 144, affirmed.

   JUSTICE KENNEDY delivered the opinion of the Court with respect to Parts I, II–B–1, and II–C, concluding that foreign corporations may not be defendants in suits brought under the ATS. Pp. 6–11, 18–19, and 25–27.

   (a) The Judiciary Act of 1789 included what is now known as the ATS, which provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in viola-

tion of the law of nations or a treaty of the United States." 28
U. S. C. §1350. The ATS is "strictly jurisdictional" and does not by its
own terms provide or delineate the definition of a cause of action for
international-law violations. *Sosa* v. *Alvarez-Machain*, 542 U. S. 692,
713–714. It was enacted against the backdrop of the general common
law, which in 1789 recognized a limited category of "torts in violation
of the law of nations," *id.,* at 714; and one of its principal objectives
was to avoid foreign entanglements by ensuring the availability of a
federal forum where the failure to have one might cause another na-
tion to hold the United States responsible for an injury to a foreign
citizen, see *id.*, at 715–719. The ATS was invoked but a few times
over its first 190 years, but with the evolving recognition—*e.g.*, in the
Nuremberg trials—that certain crimes against humanity violate
basic precepts of international law, courts began to give some redress
for violations of clear and unambiguous international human-rights
protections. After the Second Circuit first permitted plaintiffs to
bring ATS actions based on modern human-rights laws, Congress en-
acted the Torture Victim Protection Act of 1991 (TVPA), creating an
express cause of action for victims of torture and extrajudicial killing
in violation of international law. ATS suits became more frequent;
and modern ATS litigation has the potential to involve groups of for-
eign plaintiffs suing foreign corporations in the United States for al-
leged human-rights violations in other nations. In *Sosa*, the Court
held that in certain narrow circumstances courts may recognize a
common-law cause of action for claims based on the present-day law
of nations, 542 U. S., at 732, but it explicitly held that ATS litigation
implicates serious separation-of-powers and foreign-relations con-
cerns, *id.*, at 727–728. The Court subsequently held in *Kiobel* that
"the presumption against extraterritoriality applies to [ATS] claims,"
569 U. S., at 124, and that even claims that "touch and concern the
territory of the United States . . . must do so with sufficient force to
displace" that presumption, *id.*, at 124–125. Pp. 6–11.

   (b) *Sosa* is consistent with this Court's general reluctance to extend
judicially created private rights of action. Recent precedents cast
doubt on courts' authority to extend or create private causes of action,
even in the realm of domestic law, rather than leaving such decisions
to the Legislature, which is better positioned "to consider if the public
interest would be served by imposing a new substantive legal liabil-
ity," *Ziglar* v. *Abbasi*, 582 U. S. ___, ___ (internal quotation marks
omitted). This caution extends to the question whether the courts
should exercise the judicial authority to mandate a rule imposing lia-
bility upon artificial entities like corporations. Thus, in *Correctional
Services Corp.* v. *Malesko*, 534 U. S. 61, 72, the Court concluded that
Congress, not the courts, should decide whether corporate defendants

could be held liable in actions under *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388.

Neither the language of the ATS nor precedent supports an exception to these general principles in this context. Separation-of-powers concerns that counsel against courts creating private rights of action apply with particular force in the context of the ATS, which implicates foreign-policy concerns that are the province of the political branches. And courts must exercise "great caution" before recognizing new forms of liability under the ATS. *Sosa, supra,* at 728. The question whether a proper application of *Sosa* would preclude courts from ever recognizing new ATS causes of action need not be decided here, for either way it would be inappropriate for courts to extend ATS liability to foreign corporations absent further action from Congress. Pp. 18–19.

(c) The ATS was intended to promote harmony in international relations by ensuring foreign plaintiffs a remedy for international-law violations when the absence of such a remedy might provoke foreign nations to hold the United States accountable. But here, and in similar cases, the opposite is occurring. Petitioners are foreign nationals seeking millions of dollars in damages from a major Jordanian financial institution for injuries suffered in attacks by foreign terrorists in the Middle East. The only alleged connections to the United States are the CHIPS transactions in Arab Bank's New York branch and a brief allegation about a charity in Texas. At a minimum, the relatively minor connection between the terrorist attacks and the alleged conduct in the United States illustrates the perils of extending the scope of ATS liability to foreign multinational corporations like Arab Bank.

For 13 years, this litigation has caused considerable diplomatic tensions with Jordan, a critical ally that considers the litigation an affront to its sovereignty. And this is not the first time that a foreign sovereign has raised objections to ATS litigation in this Court. See *Sosa*, *supra,* at 733, n. 21. These are the very foreign-relations tensions the First Congress sought to avoid.

Nor are the courts well suited to make the required policy judgments implicated by foreign corporate liability. Like the presumption against extraterritoriality, judicial caution under *Sosa* "guards against our courts triggering . . . serious foreign policy consequences, and instead defers such decisions, quite appropriately, to the political branches." *Kiobel, supra,* at 124. Accordingly, the Court holds that foreign corporations may not be defendants in suits brought under the ATS. Pp. 25–27.

JUSTICE KENNEDY, joined by THE CHIEF JUSTICE and JUSTICE THOMAS, concluded in Parts II–A, II–B–2, II–B–3, and III:

Syllabus

(a) Before recognizing an ATS common-law action, federal courts must apply the two-part test announced in *Sosa.* The threshold question is whether a plaintiff can demonstrate that the alleged violation is "'of a norm that is specific, universal, and obligatory.'" 542 U. S., at 732. Assuming that such a norm can control, it must be determined whether allowing the case to proceed under the ATS is a proper exercise of judicial discretion or whether caution requires the political branches to grant specific authority before corporate liability can be imposed. *Id.*, at 732–733, and nn. 20–21. With regard to the first *Sosa* question, the Court need not resolve whether corporate liability is a question governed by international law or whether that law imposes liability on corporations, because, as shown by the parties' opposing arguments, there is at least sufficient doubt on the point to turn to *Sosa*'s second question: whether the Judiciary must defer to Congress to determine in the first instance whether that universal norm has been recognized and, if so, whether it should be enforced in ATS suits. Pp. 11–18.

(b) Especially here, in the realm of international law, it is important to look to analogous statutes for guidance on the appropriate boundaries of judge-made causes of action. The logical statutory analogy for an ATS common-law action is the TVPA—the only ATS cause of action created by Congress rather than the courts. Drafted as "an unambiguous and modern basis for [an ATS] cause of action," H. R. Rep. No. 102–367, p. 3, the TVPA reflects Congress' considered judgment of the proper structure for such an action. Absent a compelling justification, courts should not deviate from that model. Relevant here, the TVPA limits liability to "individuals," a term which unambiguously limits liability to natural persons, *Mohamad* v. *Palestinian Authority*, 566 U. S. 449, 453–456. Congress' decision to exclude liability for corporations in TVPA actions is all but dispositive in this case. Pp. 19–23.

(c) Other considerations relevant to the exercise of judicial discretion also counsel against allowing liability under the ATS for foreign corporations, absent congressional instructions. Corporate liability under the ATS has not been shown to be essential to serving that statute's goals, the ATS will seldom be the only way for plaintiffs to hold the perpetrators liable, and plaintiffs still can sue the individual corporate employees responsible for a violation of international law under the ATS. That the corporate form can be an instrument for inflicting grave harm and suffering poses serious and complex questions for the international community and for Congress. And this complexity makes it all the more important that Congress determine whether victims of human-rights abuses may sue foreign corporations in federal court. Pp. 23–25.

(d) In making its determination, Congress might decide that violations of international law do, or should, impose that liability to ensure that corporations make every effort to deter human-rights violations, and so that compensation for injured persons will be a cost of doing business. Or Congress could conclude that neutral judicial safeguards may not be ensured in every country and that, as a reciprocal matter, ATS liability for foreign corporations should be subject to some limitations or preconditions. Finally, Congress might find that corporate liability should be limited to cases where a corporation's management was actively complicit in the crime. Pp. 27–29.

JUSTICE ALITO concluded that the outcome in this case is justified not only by "judicial caution" but also by the separation of powers. Assuming that *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, correctly held that federal courts, exercising their authority in limited circumstances to make federal common law, may create causes of action under the ATS, this Court should not create such causes of action against foreign corporate defendants. The objective for courts in any case requiring the creation of federal common law must be "to find the rule that will best effectuate the federal policy." *Textile Workers* v. *Lincoln Mills of Ala.*, 353 U. S. 448, 457. The First Congress enacted the ATS to help the United States avoid diplomatic friction. Putting that objective together with the rules governing federal common law generally, the following principle emerges: Federal courts should decline to create federal common law causes of action whenever doing so would not materially advance the ATS's objective of avoiding diplomatic strife. Applying that principle here, it is clear that courts should not create causes of action under the ATS against foreign corporate defendants. Customary international law does not generally require corporate liability, so declining to create it under the ATS cannot give other nations just cause for complaint against the United States. To the contrary, creating causes of action against foreign corporations under the ATS may instead provoke exactly the sort of diplomatic strife inimical to the statute's fundamental purpose. Pp. 1–7.

JUSTICE GORSUCH concluded that there are two more fundamental reasons why this lawsuit should be dismissed. Pp. 1–14.

(a) This Court has suggested that Congress originally enacted the ATS to afford federal courts jurisdiction to hear tort claims related to three violations of international law that were already embodied in English common law: violations of safe conducts extended to aliens, interference with ambassadors, and piracy. *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, 715. Here, the plaintiffs seek much more. They want the federal courts to recognize a new cause of action, one that did not exist at the time of the statute's adoption, one that Congress has never authorized. They find support in a passage suggesting that the

ATS may afford federal judges "discretion [to] conside[r] [creating] new cause[s] of action" if they "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the [three specified] 18th-century" torts. *Id.,* at 725. This is doubtful, for the people's elected representatives, not judges, make the laws that govern them. But even accepting *Sosa*'s framework, a proper application of that framework would preclude courts from recognizing any new causes of action under the ATS. When courts are confronted with a request to fashion a new cause of action, "separation-of-powers principles are or should be central to the analysis." *Ziglar* v. *Abbasi*, 582 U. S. ___, ___. The first and most important question is whether Congress or the courts should decide, and the right answer "most often will be Congress." *Ibid.* There is no reason to make a special exception for the ATS, which was designed as "a jurisdictional statute creating no new causes of action." *Sosa,* 542 U. S., at 724. The context in which any *Sosa* discretion would be exercised confirms the wisdom of restraint. The "practical consequences" that might follow a decision to create a new ATS cause of action, see *id.,* at 732–733, would likely involve questions of foreign affairs and national security—matters implicating the expertise and authority not of the Judiciary but of the political branches. Pp. 2–5.

(b) Another independent problem is that this suit is by foreigners against a foreigner over the meaning of international norms. The original understanding of the ATS, which was but one clause in one section of the Judiciary Act of 1789, likely would have required a domestic defendant in order to comply with the requirements of the Diversity-of-Citizenship Clause of Article III. Precedent interpreting a neighboring provision of the Judiciary Act confirms that conclusion. See *Mossman* v. *Higginson*, 4 Dall. 12, 14. In any event, separation-of-powers limits on the judicial function and deference to the political branches should lead federal courts to require a domestic defendant before agreeing to exercise any *Sosa*-generated discretion to entertain an ATS suit. Pp. 5–14.

KENNEDY, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–B–1, and II–C, in which ROBERTS, C. J., and THOMAS, ALITO, and GORSUCH, JJ., joined, and an opinion with respect to Parts II–A, II–B–2, II–B–3, and III, in which ROBERTS, C. J., and THOMAS, J., joined. THOMAS, J., filed a concurring opinion. ALITO, J., and GORSUCH, J., filed opinions concurring in part and concurring in the judgment. SOTOMAYOR, J., filed a dissenting opinion, in which GINSBURG, BREYER, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–499

_____

## JOSEPH JESNER, ET AL., PETITIONERS *v.* ARAB BANK, PLC

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[April 24, 2018]

JUSTICE KENNEDY announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–B–1, and II–C, and an opinion with respect to Parts II–A, II–B–2, II–B–3, and III, in which THE CHIEF JUSTICE and JUSTICE THOMAS join.

Petitioners in this case, or the persons on whose behalf petitioners now assert claims, allegedly were injured or killed by terrorist acts committed abroad. Those terrorist acts, it is contended, were in part caused or facilitated by a foreign corporation. Petitioners now seek to impose liability on the foreign corporation for the conduct of its human agents, including its then-chairman and other high-ranking management officials. The suits were filed in a United States District Court under the Alien Tort Statute, commonly referred to as the ATS. See 28 U. S. C. §1350.

The foreign corporation charged with liability in these ATS suits is Arab Bank, PLC; and it is respondent here. Some of Arab Bank's officials, it is alleged, allowed the Bank to be used to transfer funds to terrorist groups in the Middle East, which in turn enabled or facilitated criminal acts of terrorism, causing the deaths or injuries for which

petitioners now seek compensation. Petitioners seek to prove Arab Bank helped the terrorists receive the moneys in part by means of currency clearances and bank transactions passing through its New York City offices, all by means of electronic transfers.

It is assumed here that those individuals who inflicted death or injury by terrorism committed crimes in violation of well-settled, fundamental precepts of international law, precepts essential for basic human-rights protections. It is assumed as well that individuals who knowingly and purposefully facilitated banking transactions to aid, enable, or facilitate the terrorist acts would themselves be committing crimes under the same international-law prohibitions.

Petitioners contend that international and domestic laws impose responsibility and liability on a corporation if its human agents use the corporation to commit crimes in violation of international laws that protect human rights. The question here is whether the Judiciary has the authority, in an ATS action, to make that determination and then to enforce that liability in ATS suits, all without any explicit authorization from Congress to do so.

The answer turns upon the proper interpretation and implementation of the ATS. The statute provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." §1350. The Court must first ask whether the law of nations imposes liability on corporations for human-rights violations committed by its employees. The Court must also ask whether it has authority and discretion in an ATS suit to impose liability on a corporation without a specific direction from Congress to do so.

# I

## A

Petitioners are plaintiffs in five ATS lawsuits filed against Arab Bank in the United States District Court for the Eastern District of New York. The suits were filed between 2004 and 2010.

A significant majority of the plaintiffs in these lawsuits—about 6,000 of them—are foreign nationals whose claims arise under the ATS. These foreign nationals are petitioners here. They allege that they or their family members were injured by terrorist attacks in the Middle East over a 10-year period. Two of the five lawsuits also included claims brought by American nationals under the Anti-Terrorism Act, 18 U. S. C. §2333(a), but those claims are not at issue.

Arab Bank is a major Jordanian financial institution with branches throughout the world, including in New York. According to the Kingdom of Jordan, Arab Bank "accounts for between one-fifth and one-third of the total market capitalization of the Amman Stock Exchange." Brief for Hashemite Kingdom of Jordan as *Amicus Curiae* 2. Petitioners allege that Arab Bank helped finance attacks by Hamas and other terrorist groups. Among other claims, petitioners allege that Arab Bank maintained bank accounts for terrorists and their front groups and allowed the accounts to be used to pay the families of suicide bombers.

Most of petitioners' allegations involve conduct that occurred in the Middle East. Yet petitioners allege as well that Arab Bank used its New York branch to clear dollar-denominated transactions through the Clearing House Interbank Payments System. That elaborate system is commonly referred to as CHIPS. It is alleged that some of these CHIPS transactions benefited terrorists.

Foreign banks often use dollar-clearing transactions to facilitate currency exchanges or to make payments in

dollars from one foreign bank account to another. Arab Bank and certain *amici* point out that CHIPS transactions are enormous both in volume and in dollar amounts. The transactions occur predominantly in the United States but are used by major banks both in the United States and abroad. The CHIPS system is used for dollar-denominated transactions and for transactions where the dollar is used as an intermediate currency to facilitate a currency exchange. Brief for Institute of International Bankers as *Amicus Curiae* 12–13, and n. 8. In New York each day, on average, about 440,000 of these transfers occur, in dollar amounts totaling about $1.5 trillion. *Id.*, at 14. The "clearance activity is an entirely mechanical function; it occurs without human intervention in the proverbial 'blink of an eye.'" *Ibid.* There seems to be no dispute that the speed and volume of these transactions are such that individual supervision is simply not a systemic reality. As noted below, substantial regulations govern these transactions, both in the United States and in Jordan.

In addition to the dollar-clearing transactions, petitioners allege that Arab Bank's New York branch was used to launder money for the Holy Land Foundation for Relief and Development (HLF), a Texas-based charity that petitioners say is affiliated with Hamas. According to petitioners, Arab Bank used its New York branch to facilitate the transfer of funds from HLF to the bank accounts of terrorist-affiliated charities in the Middle East.

During the pendency of this litigation, there was an unrelated case that also implicated the issue whether the ATS is applicable to suits in this country against foreign corporations. See *Kiobel* v. *Royal Dutch Petroleum Co.*, 621 F. 3d 111 (CA2 2010). That suit worked its way through the trial court and the Court of Appeals for the Second Circuit. The *Kiobel* litigation did not involve banking transactions. Its allegations were that holding companies incorporated in the Netherlands and the United

Kingdom had, through a Nigerian subsidiary, aided and abetted the Nigerian Government in human-rights abuses. *Id.*, at 123. In *Kiobel*, the Court of Appeals held that the ATS does not extend to suits against corporations. *Id.,* at 120. This Court granted certiorari in *Kiobel*. 565 U. S. 961 (2011).

After additional briefing and reargument in *Kiobel*, this Court held that, given all the circumstances, the suit could not be maintained under the ATS. *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. 108, 114, 124–125 (2013). The rationale of the holding, however, was not that the ATS does not extend to suits against foreign corporations. That question was left unresolved. The Court ruled, instead, that "all the relevant conduct took place outside the United States." *Id.,* at 124. Dismissal of the action was required based on the presumption against extraterritorial application of statutes.

So while this Court in *Kiobel* affirmed the ruling that the action there could not be maintained, it did not address the broader holding of the Court of Appeals that dismissal was required because corporations may not be sued under the ATS. Still, the courts of the Second Circuit deemed that broader holding to be binding precedent. As a consequence, in the instant case the District Court dismissed petitioners' ATS claims based on the earlier *Kiobel* holding in the Court of Appeals; and on review of the dismissal order the Court of Appeals, also adhering to its earlier holding, affirmed. *In re Arab Bank, PLC Alien Tort Statute Litigation*, 808 F. 3d 144 (2015). This Court granted certiorari in the instant case. 581 U. S. ___ (2017).

Since the Court of Appeals relied on its *Kiobel* holding in the instant case, it is instructive to begin with an analysis of that decision. The majority opinion in *Kiobel*, written by Judge Cabranes, held that the ATS does not apply to alleged international-law violations by a corporation. 621

F. 3d, at 120. Judge Cabranes relied in large part on the fact that international criminal tribunals have consistently limited their jurisdiction to natural persons. *Id.*, at 132–137.

Judge Leval filed a separate opinion. He concurred in the judgment on other grounds but disagreed with the proposition that the foreign corporation was not subject to suit under the ATS. *Id.*, at 196. Judge Leval conceded that "international law, of its own force, imposes no liabilities on corporations or other private juridical entities." *Id.*, at 186. But he reasoned that corporate liability for violations of international law is an issue of "civil compensatory liability" that international law leaves to individual nations. *Ibid.* Later decisions in the Courts of Appeals for the Seventh, Ninth, and District of Columbia Circuits agreed with Judge Leval and held that corporations can be subject to suit under the ATS. See *Flomo* v. *Firestone Nat. Rubber Co.*, 643 F. 3d 1013, 1017–1021 (CA7 2011); *Doe I* v. *Nestle USA, Inc.*, 766 F. 3d 1013, 1020–1022 (CA9 2014); *Doe VIII* v. *Exxon Mobil Corp.*, 654 F. 3d 11, 40–55 (CADC 2011), vacated on other grounds, 527 Fed. Appx. 7 (CADC 2013). The respective opinions by Judges Cabranes and Leval are scholarly and extensive, providing significant guidance for this Court in the case now before it.

With this background, it is now proper to turn to the history of the ATS and the decisions interpreting it.

B

Under the Articles of Confederation, the Continental Congress lacked authority to "'cause infractions of treaties, or of the law of nations to be punished.'" *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, 716 (2004) (quoting J. Madison, Journal of the Constitutional Convention 60 (E. Scott ed. 1893)). The Continental Congress urged the States to authorize suits for damages sustained by foreign

citizens as a result of violations of international law; but the state courts' vindication of the law of nations remained unsatisfactory. Concerns with the consequent international-relations tensions "persisted through the time of the Constitutional Convention." 542 U. S., at 717.

Under the Articles of Confederation, the inability of the central government to ensure adequate remedies for foreign citizens caused substantial foreign-relations problems. In 1784, the French Minister lodged a protest with the Continental Congress after a French adventurer, the Chevalier de Longchamps, assaulted the Secretary of the French Legation in Philadelphia. See *Kiobel*, 569 U. S., at 120. A few years later, a New York constable caused an international incident when he entered the house of the Dutch Ambassador and arrested one of his servants. *Ibid.* Under the Articles of Confederation, there was no national forum available to resolve disputes like these under any binding laws that were or could be enacted or enforced by a central government.

The Framers addressed these matters at the 1787 Philadelphia Convention; and, as a result, Article III of the Constitution extends the federal judicial power to "all cases affecting ambassadors, other public ministers and consuls," and "to controversies . . . between a state, or the citizens thereof, and foreign states, citizens, or subjects." §2. The First Congress passed a statute to implement these provisions: The Judiciary Act of 1789 authorized federal jurisdiction over suits involving disputes between aliens and United States citizens and suits involving diplomats. §§9, 11, 1 Stat. 76–79.

The Judiciary Act also included what is now the statute known as the ATS. §9, *id.,* at 76. As noted, the ATS is central to this case and its brief text bears repeating. Its full text is: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the

United States."  28 U. S. C. §1350.

The ATS is "strictly jurisdictional" and does not by its own terms provide or delineate the definition of a cause of action for violations of international law.  *Sosa*, 542 U. S., at 713–714.  But the statute was not enacted to sit on a shelf awaiting further legislation.  *Id.*, at 714.  Rather, Congress enacted it against the backdrop of the general common law, which in 1789 recognized a limited category of "torts in violation of the law of nations." *Ibid.*

In the 18th century, international law primarily governed relationships between and among nation-states, but in a few instances it governed individual conduct occurring outside national borders (for example, "disputes relating to prizes, to shipwrecks, to hostages, and ransom bills").  *Id*., at 714–715 (internal quotation marks omitted).   There was, furthermore, a narrow domain in which "rules binding individuals for the benefit of other individuals overlapped with" the rules governing the relationships between nation-states.  *Id.*, at 715.   As understood by Blackstone, this domain included "three specific offenses against the law of nations addressed by the criminal law of England: violation of safe conducts, infringement of the rights of ambassadors, and piracy."  *Ibid.* (citing 4 W. Blackstone, Commentaries on the Laws of England 68 (1769)).  "It was this narrow set of violations of the law of nations, admitting of a judicial remedy and at the same time threatening serious consequences in international affairs, that was probably on the minds of the men who drafted the ATS."  542 U. S., at 715.

This history teaches that Congress drafted the ATS "to furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations."  *Id.*, at 720.  The principal objective of the statute, when first enacted, was to avoid foreign entanglements by ensuring the availability of a federal forum where the failure to provide one might cause another nation to hold the United States

responsible for an injury to a foreign citizen. See *id.*, at 715–719; *Kiobel*, 569 U. S., at 123–124.

Over the first 190 years or so after its enactment, the ATS was invoked but a few times. Yet with the evolving recognition—for instance, in the Nuremberg trials after World War II—that certain acts constituting crimes against humanity are in violation of basic precepts of international law, courts began to give some redress for violations of international human-rights protections that are clear and unambiguous. In the modern era this began with the decision of the Court of Appeals for the Second Circuit in *Filartiga* v. *Pena-Irala*, 630 F. 2d 876 (1980).

In *Filartiga*, it was alleged that a young man had been tortured and murdered by Paraguayan police officers, and that an officer named Pena-Irala was one of the supervisors and perpetrators. Some members of the victim's family were in the United States on visas. When they discovered that Pena-Irala himself was living in New York, they filed suit against him. The action, seeking damages for the suffering and death he allegedly had caused, was filed in the United States District Court for the Eastern District of New York. The Court of Appeals found that there was jurisdiction under the ATS. For this holding it relied upon the universal acknowledgment that acts of official torture are contrary to the law of nations. *Id.*, at 890. This Court did not review that decision.

In the midst of debates in the courts of appeals over whether the court in *Filartiga* was correct in holding that plaintiffs could bring ATS actions based on modern human-rights laws absent an express cause of action created by an additional statute, Congress enacted the Torture Victim Protection Act of 1991 (TVPA), 106 Stat. 73, note following 28 U. S. C. §1350. H. R. Rep. No. 102–367, pp. 3–4 (1991) (H. R. Rep.) (citing *Tel-Oren* v. *Libyan Arab Republic*, 726 F. 2d 774 (CADC 1984)); S. Rep. No. 102–249, pp. 3–5 (1991) (S. Rep.) (same). The TVPA—which is

codified as a note following the ATS—creates an express cause of action for victims of torture and extrajudicial killing in violation of international law.

After *Filartiga* and the TVPA, ATS lawsuits became more frequent. Modern ATS litigation has the potential to involve large groups of foreign plaintiffs suing foreign corporations in the United States for alleged human-rights violations in other nations. For example, in *Kiobel* the plaintiffs were Nigerian nationals who sued Dutch, British, and Nigerian corporations for alleged crimes in Nigeria. 569 U. S., at 111–112. The extent and scope of this litigation in United States courts have resulted in criticism here and abroad. See *id.*, at 124 (noting objections to ATS litigation by Canada, Germany, Indonesia, Papua New Guinea, South Africa, Switzerland, and the United Kingdom).

In *Sosa*, the Court considered the question whether courts may recognize new, enforceable international norms in ATS lawsuits. 542 U. S., at 730–731. The *Sosa* Court acknowledged the decisions made in *Filartiga* and similar cases; and it held that in certain narrow circumstances courts may recognize a common-law cause of action for claims based on the present-day law of nations, in addition to the "historical paradigms familiar when §1350 was enacted." 542 U. S., at 732. The Court was quite explicit, however, in holding that ATS litigation implicates serious separation-of-powers and foreign-relations concerns. *Id.*, at 727–728. Thus, ATS claims must be "subject to vigilant doorkeeping." *Id.*, at 729.

This Court next addressed the ATS in *Kiobel*, the case already noted. There, this Court held that "the presumption against extraterritoriality applies to claims under the ATS, and that nothing in the statute rebuts the presumption." 569 U. S., at 124. The Court added that "even where the claims touch and concern the territory of the United States, they must do so with sufficient force to

displace the presumption against extraterritorial applica-
tion." *Id.*, at 124–125.

## II

With these principles in mind, this Court now must
decide whether common-law liability under the ATS ex-
tends to a foreign corporate defendant. It could be argued,
under the Court's holding in *Kiobel*, that even if, under
accepted principles of international law and federal com-
mon law, corporations are subject to ATS liability for
human-rights crimes committed by their human agents, in
this case the activities of the defendant corporation and
the alleged actions of its employees have insufficient
connections to the United States to subject it to jurisdic-
tion under the ATS. Various *amici* urge this as a rationale
to affirm here, while the Government argues that the
Court should remand this case so the Court of Appeals can
address the issue in the first instance. There are substan-
tial arguments on both sides of that question; but it is not
the question on which this Court granted certiorari, nor is
it the question that has divided the Courts of Appeals.

The question whether foreign corporations are subject to
liability under the ATS should be addressed; for, if there is
no liability for Arab Bank, the lengthy and costly litigation
concerning whether corporate contacts like those alleged
here suffice to impose liability would be pointless. In
addition, a remand to the Court of Appeals would require
prolonging litigation that already has caused significant
diplomatic tensions with Jordan for more than a decade.
So it is proper for this Court to decide whether corpora-
tions, or at least foreign corporations, are subject to liabil-
ity in an ATS suit filed in a United States district court.

Before recognizing a common-law action under the ATS,
federal courts must apply the test announced in *Sosa.* An
initial, threshold question is whether a plaintiff can
demonstrate that the alleged violation is "of a norm that is

specific, universal, and obligatory." 542 U. S., at 732 (internal quotation marks omitted). And even assuming that, under international law, there is a specific norm that can be controlling, it must be determined further whether allowing this case to proceed under the ATS is a proper exercise of judicial discretion, or instead whether caution requires the political branches to grant specific authority before corporate liability can be imposed. See *id.*, at 732–733, and nn. 20–21. "[T]he potential implications for the foreign relations of the United States of recognizing such causes should make courts particularly wary of impinging on the discretion of the Legislative and   Executive Branches in managing foreign affairs." *Id.*, at 727.

It must be said that some of the considerations that pertain to determining whether there is a specific, universal, and obligatory norm that is established under international law are applicable as well in determining whether deference must be given to the political branches. For instance, the fact that the charters of some international tribunals and the provisions of some congressional statutes addressing international human-rights violations are specifically limited to individual wrongdoers, and thus foreclose corporate liability, has significant bearing both on the content of the norm being asserted and the question whether courts should defer to Congress. The two inquiries inform each other and are, to that extent, not altogether discrete.

With that introduction, it is proper now to turn first to the question whether there is an international-law norm imposing liability on corporations for acts of their employees that contravene fundamental human rights.

### A

Petitioners and Arab Bank disagree as to whether corporate liability is a question of international law or only a question of judicial authority and discretion under domes-

tic law.  The dispute centers on a footnote in *Sosa*.  In the
course of holding that international norms must be "suffi-
ciently definite to support a cause of action," the Court in
*Sosa* noted that a "related consideration is whether inter-
national law extends the scope of liability for a violation of
a given norm to the perpetrator being sued, if the defend-
ant is a private actor such as a corporation or individual."
*Id.*, at 732, and n. 20.

In the Court of Appeals' decision in *Kiobel*, the majority
opinion by Judge Cabranes interpreted footnote 20 to
mean that corporate defendants may be held liable under
the ATS only if there is a specific, universal, and obligatory
norm that corporations are liable for violations of interna-
tional law.  621 F. 3d, at 127.  In Judge Cabranes' view,
"[i]nternational law is not silent on the question of the
*subjects* of international law—that is, those that, to vary-
ing extents, have legal status, personality, rights, and
*duties* under international law," "[n]or does international
law leave to individual States the responsibility of defin-
ing those subjects."  *Id.*, at 126 (internal quotation marks
omitted).  There is considerable force and weight to the
position articulated by Judge Cabranes.  And, assuming
the Court of Appeals was correct that under *Sosa* corpo-
rate liability is a question of international law, there is an
equally strong argument that petitioners cannot satisfy
the high bar of demonstrating a specific, universal, and
obligatory norm of liability for corporations.  Indeed,
Judge Leval agreed with the conclusion that international
law does "not provide for any form of liability of corpora-
tions."  *Kiobel*, 621 F. 3d, at 186.

1

In modern times, there is no doubt, of course, that "the
international community has come to recognize the com-
mon danger posed by the flagrant disregard of basic hu-
man rights," leading "the nations of the world to recognize

that respect for fundamental human rights is in their individual and collective interest." *Filartiga*, 630 F. 2d, at 890. That principle and commitment support the conclusion that human-rights norms must bind the individual men and women responsible for committing humanity's most terrible crimes, not just nation-states in their interactions with one another. "The singular achievement of international law since the Second World War has come in the area of human rights," where international law now imposes duties on individuals as well as nation-states. *Kiobel*, 621 F. 3d, at 118.

It does not follow, however, that current principles of international law extend liability—civil or criminal—for human-rights violations to corporations or other artificial entities. This is confirmed by the fact that the charters of respective international criminal tribunals often exclude corporations from their jurisdictional reach.

The Charter for the Nuremberg Tribunal, created by the Allies after World War II, provided that the Tribunal had jurisdiction over natural persons only. See Agreement for Prosecution and Punishment of Major War Criminals of the European Axis, Art. 6, Aug. 8, 1945, 59 Stat. 1547, E. A. S. 472. Later, a United States Military Tribunal prosecuted 24 executives of the German corporation IG Farben. 7 Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10, pp. 11–60 (1952) (*The Farben Case*). Among other crimes, Farben's employees had operated a slave-labor camp at Auschwitz and "knowingly and intentionally manufactured and provided" the poison gas used in the Nazi death chambers. *Kiobel*, 621 F. 3d, at 135. Although the Military Tribunal "used the term 'Farben' as descriptive of the instrumentality of cohesion in the name of which" the crimes were committed, the Tribunal noted that "corporations act through individuals." 8 *The Farben Case*, at 1153. Farben itself was not held liable. See *ibid.*

The jurisdictional reach of more recent international tribunals also has been limited to "natural persons." See Statute of the International Criminal Tribunal for the Former Yugoslavia, S. C. Res. 827 (May 25, 1993), adopting U. N. Secretary-General Rep. Pursuant to Paragraph 2 of Security Council Resolution 808, Art. 6, U. N. Doc. S/25704 (May 3, 1993); Statute of the International Tribunal for Rwanda, Art. 5, S. C. Res. 955, Art. 5 (Nov. 8, 1994). The Rome Statute of the International Criminal Court, for example, limits that tribunal's jurisdiction to "natural persons." See Rome Statute of the International Criminal Court, Art. 25(1), July 17, 1998, 2187 U. N. T. S. 90. The drafters of the Rome Statute considered, but rejected, a proposal to give the International Criminal Court jurisdiction over corporations. Eser, Individual Criminal Responsibility, in 1 Rome Statute of the International Criminal Court 767, 778–779 (A. Cassese et al. eds. 2002).

The international community's conscious decision to limit the authority of these international tribunals to natural persons counsels against a broad holding that there is a specific, universal, and obligatory norm of corporate liability under currently prevailing international law.

2

In light of the sources just discussed, the sources petitioners rely on to support their contention that liability for corporations is well established as a matter of international law lend weak support to their position.

Petitioners first point to the International Convention for the Suppression of the Financing of Terrorism. This Convention imposes an obligation on "Each State Party" "to enable a legal entity located in its territory or organized under its laws to be held liable when a person responsible for the management or control of that legal entity has, in that capacity," violated the Convention.

International Convention for the Suppression of the Financing of Terrorism, Dec. 9, 1999, S. Treaty Doc. No. 106–49, 2178 U. N. T. S. 232.  But by its terms the Convention imposes its obligations only on nation-states "to enable" corporations to be held liable in certain circumstances under domestic law.  The United States and other nations, including Jordan, may fulfill their obligations under the Convention by adopting detailed regulatory regimes governing financial institutions.  See, *e.g.*, 18 U. S. C. §2333(a) (private right of action under the Anti-Terrorism Act); 31 U. S. C. §5311 *et seq.* (Bank Secrecy Act); 31 CFR pt. 595 (2017) (Terrorism Sanctions Regulations); Brief for Central Bank of Jordan as *Amicus Curiae* 5 (describing Jordan's "comprehensive approach to preventing money laundering and terrorist financing").  The Convention neither requires nor authorizes courts, without congressional authorization, to displace those detailed regulatory regimes by allowing common-law actions under the ATS.  And nothing in the Convention's text requires signatories to hold corporations liable in common-law tort actions raising claims under international law.

In addition, petitioners and their *amici* cite a few cases from other nations and the Special Tribunal for Lebanon that, according to petitioners, are examples of corporations being held liable for violations of international law.  *E.g.*, Brief for Petitioners 50–51.  Yet even assuming that these cases are relevant examples, at most they demonstrate that corporate liability might be permissible under international law in some circumstances.  That falls far short of establishing a specific, universal, and obligatory norm of corporate liability.

It must be remembered that international law is distinct from domestic law in its domain as well as its objectives.  International human-rights norms prohibit acts repugnant to all civilized peoples—crimes like genocide, torture, and slavery, that make their perpetrators "enem[ies] of all

mankind." *Sosa*, 542 U. S., at 732 (internal quotation marks omitted). In the American legal system, of course, corporations are often subject to liability for the conduct of their human employees, and so it may seem necessary and natural that corporate entities are liable for violations of international law under the ATS. It is true, furthermore, that the enormity of the offenses that can be committed against persons in violation of international human-rights protections can be cited to show that corporations should be subject to liability for the crimes of their human agents. But the international community has not yet taken that step, at least in the specific, universal, and obligatory manner required by *Sosa*. Indeed, there is precedent to the contrary in the statement during the Nuremberg proceedings that "[c]rimes against international law are committed by men, not by abstract entities, and only by punishing individuals who commit such crimes can the provisions of international law be enforced." *The Nurnberg Trial*, 6 F. R. D. 69, 110 (1946).

Petitioners also contend that international law leaves questions of remedies open for determination under domestic law. As they see it, corporate liability is a remedial consideration, not a substantive principle that must be supported by a universal and obligatory norm if it is to be implemented under the ATS. According to petitioners, footnote 20 in *Sosa* does no more than recognize the distinction in international law between state and private actors. But, as just explained, there is a similar distinction in international law between corporations and natural persons. And it is far from obvious why the question whether corporations may be held liable for the international crimes of their employees is a mere question of remedy.

In any event, the Court need not resolve the questions whether corporate liability is a question that is governed by international law, or, if so, whether international law

imposes liability on corporations. There is at least sufficient doubt on the point to turn to *Sosa*'s second question—whether the Judiciary must defer to Congress, allowing it to determine in the first instance whether that universal norm has been recognized and, if so, whether it is prudent and necessary to direct its enforcement in suits under the ATS.

## B

### 1

*Sosa* is consistent with this Court's general reluctance to extend judicially created private rights of action. The Court's recent precedents cast doubt on the authority of courts to extend or create private causes of action even in the realm of domestic law, where this Court has "recently and repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases." 542 U. S., at 727 (citing *Correctional Services Corp.* v. *Malesko*, 534 U. S. 61, 68 (2001); *Alexander* v. *Sandoval*, 532 U. S. 275, 286–287 (2001)). That is because "the Legislature is in the better position to consider if the public interest would be served by imposing a new substantive legal liability." *Ziglar* v. *Abbasi*, 582 U. S. ___, ___ (2017) (slip op., at 12) (internal quotation marks omitted). Thus, "if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy, . . . courts must refrain from creating the remedy in order to respect the role of Congress." *Id.*, at ___ (slip op., at 13).

This caution extends to the question whether the courts should exercise the judicial authority to mandate a rule that imposes liability upon artificial entities like corporations. Thus, in *Malesko* the Court held that corporate defendants may not be held liable in *Bivens* actions. See *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971). Allowing corporate liability would have been a

"marked extension" of *Bivens* that was unnecessary to advance its purpose of holding individual officers responsible for "engaging in unconstitutional wrongdoing." *Malesko*, 534 U. S., at 74. Whether corporate defendants should be subject to suit was "a question for Congress, not us, to decide." *Id.*, at 72.

Neither the language of the ATS nor the precedents interpreting it support an exception to these general principles in this context. In fact, the separation-of-powers concerns that counsel against courts creating private rights of action apply with particular force in the context of the ATS. See *infra*, at 25–26. The political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns. See *Kiobel*, 569 U. S., at 116–117. That the ATS implicates foreign relations "is itself a reason for a high bar to new private causes of action for violating international law." *Sosa, supra*, at 727.

In *Sosa*, the Court emphasized that federal courts must exercise "great caution" before recognizing new forms of liability under the ATS. 542 U. S., at 728. In light of the foreign-policy and separation-of-powers concerns inherent in ATS litigation, there is an argument that a proper application of *Sosa* would preclude courts from ever recognizing any new causes of action under the ATS. But the Court need not resolve that question in this case. Either way, absent further action from Congress it would be inappropriate for courts to extend ATS liability to foreign corporations.

2

Even in areas less fraught with foreign-policy consequences, the Court looks to analogous statutes for guidance on the appropriate boundaries of judge-made causes of action. See, *e.g.*, *Miles* v. *Apex Marine Corp.*, 498 U. S. 19, 24 (1990); *Blue Chip Stamps* v. *Manor Drug Stores*,

421 U. S. 723, 736 (1975). Doing so is even more important in the realm of international law, where "the general practice has been to look for legislative guidance before exercising innovative authority over substantive law." *Sosa*, *supra*, at 726.

Here, the logical place to look for a statutory analogy to an ATS common-law action is the TVPA—the only cause of action under the ATS created by Congress rather than the courts. As explained above, Congress drafted the TVPA to "establish an unambiguous and modern basis for a cause of action" under the ATS. H. R. Rep., at 3; S. Rep., at 4–5. Congress took care to delineate the TVPA's boundaries. In doing so, it could weigh the foreign-policy implications of its rule. Among other things, Congress specified who may be liable, created an exhaustion requirement, and established a limitations period. *Kiobel*, 569 U. S., at 117. In *Kiobel*, the Court recognized that "[e]ach of these decisions carries with it significant foreign policy implications." *Ibid.* The TVPA reflects Congress' considered judgment of the proper structure for a right of action under the ATS. Absent a compelling justification, courts should not deviate from that model.

The key feature of the TVPA for this case is that it limits liability to "individuals," which, the Court has held, unambiguously limits liability to natural persons. *Mohamad* v. *Palestinian Authority*, 566 U. S. 449, 453–456 (2012). Congress' decision to exclude liability for corporations in actions brought under the TVPA is all but dispositive of the present case. That decision illustrates that significant foreign-policy implications require the courts to draw a careful balance in defining the scope of actions under the ATS. It would be inconsistent with that balance to create a remedy broader than the one created by Congress. Indeed, it "would be remarkable to take a more aggressive role in exercising a jurisdiction that remained largely in shadow for much of the prior two centuries."

*Sosa*, *supra*, at 726.

According to petitioners, the TVPA is not a useful guidepost because Congress limited liability under that statute to "individuals" out of concern for the sovereign immunity of foreign governmental entities, not out of general hesitation about corporate liability under the ATS. The argument seems to run as follows: The TVPA provides a right of action to victims of torture and extrajudicial killing, and under international law those human-rights violations require state action. For a corporation's employees to violate these norms therefore would require the corporation to be an instrumentality of a foreign state or other sovereign entity. That concern is absent, petitioners insist, for crimes that lack a state-action requirement—for example, genocide, slavery, or, in the present case, the financing of terrorists.

At least two flaws inhere in this argument. First, in *Mohamad* the Court unanimously rejected petitioners' account of the TVPA's legislative history. 566 U. S., at 453, 458–460. The Court instead read that history to demonstrate that Congress acted to exclude all corporate entities, not just the sovereign ones. *Id.*, at 459–460 (citing Hearing and Markup on H. R. 1417 before the House Committee on Foreign Affairs and Its Subcommittee on Human Rights and International Organizations, 100th Cong., 2d Sess., 87–88 (1988)); see also 566 U. S., at 461–462 (BREYER, J., concurring). Second, even for international-law norms that do not require state action, plaintiffs can still use corporations as surrogate defendants to challenge the conduct of foreign governments. In *Kiobel*, for example, the plaintiffs sought to hold a corporate defendant liable for "aiding and abetting the Nigerian Government in committing," among other things, "crimes against humanity." 569 U. S., at 114; see also, *e.g.*, *Sarei* v. *Rio Tinto, PLC*, 671 F. 3d 736, 761–763 (CA9 2011) (en banc) (corporate defendant allegedly used Papua New

Guinea's military to commit genocide), vacated and re-manded, 569 U. S. 945 (2013).

Petitioners contend that, instead of the TVPA, the most analogous statute here is the Anti-Terrorism Act. That Act does permit suits against corporate entities. See 18 U. S. C. §§ 2331(3), 2333(d)(2). In fact, in these suits some of the foreign plaintiffs joined their claims to those of United States nationals suing Arab Bank under the Anti-Terrorism Act. But the Anti-Terrorism Act provides a cause of action only to "national[s] of the United States," and their "estate, survivors, or heirs." §2333(a). In contrast, the ATS is available only for claims brought by "an alien." 28 U. S. C. §1350. A statute that excludes foreign nationals (with the possible exception of foreign survivors or heirs) is an inapt analogy for a common-law cause of action that provides a remedy for foreign nationals only.

To the extent, furthermore, that the Anti-Terrorism Act is relevant it suggests that there should be no common-law action under the ATS for allegations like petitioners'. Otherwise, foreign plaintiffs could bypass Congress' express limitations on liability under the Anti-Terrorism Act simply by bringing an ATS lawsuit. The Anti-Terrorism Act, as mentioned above, is part of a comprehensive statutory and regulatory regime that prohibits terrorism and terrorism financing. The detailed regulatory structures prescribed by Congress and the federal agencies charged with oversight of financial institutions reflect the careful deliberation of the political branches on when, and how, banks should be held liable for the financing of terrorism. It would be inappropriate for courts to displace this considered statutory and regulatory structure by holding banks subject to common-law liability in actions filed under the ATS.

In any event, even if the Anti-Terrorism Act were a suitable model for an ATS suit, Congress' decision in the TVPA to limit liability to individuals still demonstrates

that there are two reasonable choices. In this area, that is dispositive—Congress, not the Judiciary, must decide whether to expand the scope of liability under the ATS to include foreign corporations.

3

Other considerations relevant to the exercise of judicial discretion also counsel against allowing liability under the ATS for foreign corporations, absent instructions from Congress to do so. It has not been shown that corporate liability under the ATS is essential to serve the goals of the statute. As to the question of adequate remedies, the ATS will seldom be the only way for plaintiffs to hold the perpetrators liable. See, *e.g.*, 18 U. S. C. §1091 (criminal prohibition on genocide); §1595 (civil remedy for victims of slavery). And plaintiffs still can sue the individual corporate employees responsible for a violation of international law under the ATS. If the Court were to hold that foreign corporations have liability for international-law violations, then plaintiffs may well ignore the human perpetrators and concentrate instead on multinational corporate entities.

As explained above, in the context of criminal tribunals international law itself generally limits liability to natural persons. Although the Court need not decide whether the seeming absence of a specific, universal, and obligatory norm of corporate liability under international law by itself forecloses petitioners' claims against Arab Bank, or whether this is an issue governed by international law, the lack of a clear and well-established international-law rule is of critical relevance in determining whether courts should extend ATS liability to foreign corporations without specific congressional authorization to do so. That is especially so in light of the TVPA's limitation of liability to natural persons, which parallels the distinction between corporations and individuals in international law.

If, moreover, the Court were to hold that foreign corporations may be held liable under the ATS, that precedent-setting principle "would imply that other nations, also applying the law of nations, could hale our [corporations] into their courts for alleged violations of the law of nations." *Kiobel*, 569 U. S., at 124. This judicially mandated doctrine, in turn, could subject American corporations to an immediate, constant risk of claims seeking to impose massive liability for the alleged conduct of their employees and subsidiaries around the world, all as determined in foreign courts, thereby "hinder[ing] global investment in developing economies, where it is most needed." Brief for United States as *Amicus Curiae* in *American Isuzu Motors, Inc.* v. *Ntsebeza*, O. T. 2007, No. 07–919, p. 20 (internal quotation marks omitted).

In other words, allowing plaintiffs to sue foreign corporations under the ATS could establish a precedent that discourages American corporations from investing abroad, including in developing economies where the host government might have a history of alleged human-rights violations, or where judicial systems might lack the safeguards of United States courts. And, in consequence, that often might deter the active corporate investment that contributes to the economic development that so often is an essential foundation for human rights.

It is also true, of course, that natural persons can and do use corporations for sinister purposes, including conduct that violates international law. That the corporate form can be an instrument for inflicting grave harm and suffering poses serious and complex questions both for the international community and for Congress. So there are strong arguments for permitting the victims to seek relief from corporations themselves. Yet the urgency and complexity of this problem make it all the more important that Congress determine whether victims of human-rights abuses may sue foreign corporations in federal courts in

the United States. Congress, not the Judiciary, is the branch with "the facilities necessary to make fairly such an important policy decision where the possibilities of international discord are so evident and retaliative action so certain." *Kiobel*, 569 U. S., at 116 (internal quotation marks omitted). As noted further below, there are many delicate and important considerations that Congress is in a better position to examine in determining whether and how best to impose corporate liability. And, as the TVPA illustrates, Congress is well aware of the necessity of clarifying the proper scope of liability under the ATS in a timely way.

C

The ATS was intended to promote harmony in international relations by ensuring foreign plaintiffs a remedy for international-law violations in circumstances where the absence of such a remedy might provoke foreign nations to hold the United States accountable. Brief for United States as *Amicus Curiae* 7. But here, and in similar cases, the opposite is occurring.

Petitioners are foreign nationals seeking hundreds of millions of dollars in damages from a major Jordanian financial institution for injuries suffered in attacks by foreign terrorists in the Middle East. The only alleged connections to the United States are the CHIPS transactions in Arab Bank's New York branch and a brief allegation regarding a charity in Texas. The Court of Appeals did not address, and the Court need not now decide, whether these allegations are sufficient to "touch and concern" the United States under *Kiobel*. See 569 U. S., at 124–125.

At a minimum, the relatively minor connection between the terrorist attacks at issue in this case and the alleged conduct in the United States well illustrates the perils of extending the scope of ATS liability to foreign multina-

tional corporations like Arab Bank.  For 13 years, this litigation has "caused significant diplomatic tensions" with Jordan, a critical ally in one of the world's most sensitive regions.  Brief for United States as *Amicus Curiae* 30. "Jordan is a key counterterrorism partner, especially in the global campaign to defeat the Islamic State in Iraq and Syria." *Id.*, at 31.  The United States explains that Arab Bank itself is "a constructive partner with the United States in working to prevent terrorist financing." *Id.*, at 32 (internal quotation marks omitted).  Jordan considers the instant litigation to be a "grave affront" to its sovereignty.  See Brief for Hashemite Kingdom of Jordan as *Amicus Curiae* 3; see *ibid.* ("By exposing Arab Bank to massive liability, this suit thus threatens to destabilize Jordan's economy and undermine its cooperation with the United States").

This is not the first time, furthermore, that a foreign sovereign has appeared in this Court to note its objections to ATS litigation.  *Sosa*, 542 U. S., at 733, n. 21 (noting objections by the European Commission and South Africa); Brief for the Federal Republic of Germany as *Amicus Curiae* in *Kiobel* v. *Royal Dutch Petroleum Co.*, O. T. 2012, No. 10–1491, p. 1; Brief for the Government of the United Kingdom of Great Britain and Northern Ireland and the Kingdom of the Netherlands as *Amici Curiae* in No. 10–1491, p. 3.  These are the very foreign-relations tensions the First Congress sought to avoid.

Petitioners insist that whatever the faults of this litigation—for example, its tenuous connections to the United States and the prolonged diplomatic disruptions it has caused—the fact that Arab Bank is a foreign corporate entity, as distinct from a natural person, is not one of them.  That misses the point.  As demonstrated by this litigation, foreign corporate defendants create unique problems.  And courts are not well suited to make the required policy judgments that are implicated by corporate

liability in cases like this one.

Like the presumption against extraterritoriality, judicial caution under *Sosa* "guards against our courts triggering . . . serious foreign policy consequences, and instead defers such decisions, quite appropriately, to the political branches." *Kiobel*, 569 U. S., at 124. If, in light of all the concerns that must be weighed before imposing liability on foreign corporations via ATS suits, the Court were to hold that it has the discretion to make that determination, then the cautionary language of *Sosa* would be little more than empty rhetoric. Accordingly, the Court holds that foreign corporations may not be defendants in suits brought under the ATS.

## III

With the ATS, the First Congress provided a federal remedy for a narrow category of international-law violations committed by individuals. Whether, more than two centuries on, a similar remedy should be available against foreign corporations is similarly a decision that Congress must make.

The political branches can determine, referring to international law to the extent they deem proper, whether to impose liability for human-rights violations upon foreign corporations in this Nation's courts, and, conversely, that courts in other countries should be able to hold United States corporations liable. Congress might determine that violations of international law do, or should, impose that liability to ensure that corporations make every effort to deter human-rights violations, and so that, even when those efforts cannot be faulted, compensation for injured persons will be a cost of doing business. If Congress and the Executive were to determine that corporations should be liable for violations of international law, that decision would have special power and force because it would be made by the branches most immediately responsive to,

and accountable to, the electorate.

It is still another possibility that, in the careful exercise of its expertise in the field of foreign affairs, Congress might conclude that neutral judicial safeguards may not be ensured in every country; and so, as a reciprocal matter, it could determine that liability of foreign corporations under the ATS should be subject to some limitations or preconditions. Congress might deem this more careful course to be the best way to encourage American corporations to undertake the extensive investments and foreign operations that can be an important beginning point for creating the infrastructures that allow human rights, as well as judicial safeguards, to emerge. These delicate judgments, involving a balance that it is the prerogative of the political branches to make, especially in the field of foreign affairs, would, once again, also be entitled to special respect, especially because those careful distinctions might themselves advance the Rule of Law. All this underscores the important separation-of-powers concerns that require the Judiciary to refrain from making these kinds of decisions under the ATS. The political branches, moreover, surely are better positioned than the Judiciary to determine if corporate liability would, or would not, create special risks of disrupting good relations with foreign governments.

Finally, Congress might find that corporate liability should be limited to cases where a corporation's management was actively complicit in the crime. Cf. ALI, Model Penal Code §2.07(1)(c) (1985) (a corporation may be held criminally liable where "the commission of the offense was authorized, requested, commanded, performed or recklessly tolerated by the board of directors or by a high managerial agent acting on behalf of the corporation within the scope of his office or employment"). Again, the political branches are better equipped to make the preliminary findings and consequent conclusions that should inform this

Opinion of KENNEDY, J.

determination.

These and other considerations that must shape and instruct the formulation of principles of international and domestic law are matters that the political branches are in the better position to define and articulate.  For these reasons, judicial deference requires that any imposition of corporate liability on foreign corporations for violations of international law must be determined in the first instance by the political branches of the Government.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–499

_____

## JOSEPH JESNER, ET AL., PETITIONERS *v.* ARAB BANK, PLC

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[April 24, 2018]

JUSTICE THOMAS, concurring.

I join the Court's opinion in full because it correctly applies our precedents. I also agree with the points raised by my concurring colleagues. Courts should not be in the business of creating new causes of action under the Alien Tort Statute, see *post,* at 2–5 (GORSUCH, J., concurring in part and concurring in judgment), especially when it risks international strife, see *post,* at 3–7 (ALITO, J., concurring in part and concurring in judgment). And the Alien Tort Statute likely does not apply to suits between foreign plaintiffs and foreign defendants. See *post,* at 5–14 (opinion of GORSUCH, J.).

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–499

_____

## JOSEPH JESNER, ET AL., PETITIONERS v. ARAB BANK, PLC

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[April 24, 2018]

JUSTICE ALITO, concurring in part and concurring in the judgment.

Creating causes of action under the Alien Tort Statute against foreign corporate defendants would precipitate exactly the sort of diplomatic strife that the law was enacted to prevent. As a result, I agree with the Court that we should not take that step, and I join Parts I, II–B–1, and II–C of the opinion of the Court. I write separately to elaborate on why that outcome is compelled not only by "judicial caution," *ante*, at 27 (majority opinion), but also by the separation of powers.

## I

The ATS is a jurisdictional statute. It provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U. S. C. §1350. By its terms, the ATS does not create any causes of action.

In *Sosa* v. *Alvarez-Machain*, 542 U. S. 692 (2004), however, this Court nevertheless held that federal courts, exercising their authority in limited circumstances to make federal common law, may create causes of action that aliens may assert under the ATS. That holding takes some explaining.

According to *Sosa*, when the First Congress enacted the ATS in 1789, it assumed that the statute would "have practical effect the moment it became law" because the general common law "would provide a cause of action for [a] modest number of international law violations." *Id.*, at 724. That assumption, however, depended on the continued existence of the general common law. And in 1938—a century and a half after Congress enacted the ATS—this Court rejected the "fallacy" underlying the general common law, declaring definitively that "[t]here is no federal general common law." *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, 78, 79 (1938). That left the ATS in an awkward spot: Congress had not created any causes of action for the statute on the assumption that litigants would use those provided by the general common law, but now the general common law was no more.

In *Sosa*, this Court did its best to resolve that problem. "[I]t would be unreasonable to assume," the Court explained, "that the First Congress would have expected federal courts to lose all capacity to recognize enforceable international norms simply because the [general] common law might lose some metaphysical cachet on the road to modern realism." 542 U. S., at 730. Although the general common law was gone, the Court concluded, federal courts could still exercise their authority to create so-called "federal common law" for those "'few and restricted'" areas "in which Congress has given the courts the power to develop substantive law." *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S. 630, 640 (1981). *Sosa* interpreted the ATS as conferring such authorization.

As a result, *Sosa* held that federal courts, subject to certain conditions, may "recognize private causes of action [under the ATS] for certain torts in violation of the law of nations." 542 U. S., at 724. But before doing so, *Sosa* stressed, courts should follow a two-step process. First, they should ensure that the contemplated cause of action

reflects an international law norm that is "'specific, universal and obligatory.'" *Id.*, at 732. Second, if a suitable norm is identified, federal courts should decide whether there is any other reason to limit "the availability of relief." *Id.*, at 733, n. 21.

## II

For the reasons articulated by Justice Scalia in *Sosa* and by JUSTICE GORSUCH today, I am not certain that *Sosa* was correctly decided. See *id.*, at 739–751 (Scalia, J., dissenting); *post*, at 2–5 (GORSUCH, J., concurring in part and concurring in judgment). But even taking that decision on its own terms, this Court should not create causes of action under the ATS against foreign corporate defendants. As part of *Sosa*'s second step, a court should decline to create a cause of action as a matter of federal common law where the result would be to further, not avoid, diplomatic strife. Properly applied, that rule easily resolves the question presented by this case.*

*Sosa* interpreted the ATS to authorize the federal courts to create causes of action as a matter of federal common law. We have repeatedly emphasized that "in fashioning federal [common law] principles to govern areas left open by Congress, our function is to effectuate congressional policy." *United States* v. *Kimbell Foods, Inc.*, 440 U. S. 715, 738 (1979). Fidelity to congressional policy is not only prudent but necessary: Going beyond the bounds of Congress's authorization would mean unconstitutionally usurping part of the "legislative Powers." U. S. Const., Art. I, §1. Accordingly, the objective for courts in every case requiring the creation of federal common law must be

---

*Because this case involves a foreign corporation, we have no need to reach the question whether an alien may sue a United States corporation under the ATS. And since such a suit may generally be brought in federal court based on diversity jurisdiction, 28 U. S. C. §1332(a)(2), it is unclear why ATS jurisdiction would be needed in that situation.

"to find the rule that will best effectuate the federal policy." *Textile Workers* v. *Lincoln Mills of Ala.*, 353 U. S. 448, 457 (1957).

The ATS was meant to help the United States avoid diplomatic friction. The First Congress enacted the law to provide a forum for adjudicating that "narrow set of violations of the law of nations" that, if left unaddressed, "threaten[ed] serious consequences" for the United States. *Sosa*, 542 U. S., at 715; see also Brief for Professors of International Law et al. as *Amici Curiae* 7–12. Specifically, the First Congress was concerned about offenses like piracy, violation of safe conducts, and infringement of the rights of ambassadors, each of which "if not adequately redressed could rise to an issue of war." *Sosa*, *supra*, at 715. That threat was existentially terrifying for the young Nation. See *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. 108, 123–124 (2013). To minimize the danger, the First Congress enacted the ATS, "ensur[ing] that the United States could provide a forum for adjudicating such incidents" and thus helping the Nation avoid further diplomatic imbroglios. *Id.*, at 124; see *ante*, at 25 (majority opinion).

Putting that objective together with the rules governing federal common law generally, the following principle emerges: Federal courts should decline to create federal common law causes of action under *Sosa*'s second step whenever doing so would not materially advance the ATS's objective of avoiding diplomatic strife. And applying that principle here, it is clear that federal courts should not create causes of action under the ATS against foreign corporate defendants. All parties agree that customary international law does not *require* corporate liability as a general matter. See Brief for Petitioners 30; Brief for Respondent 22; see also *ante*, at 17 (plurality opinion); *post*, at 3–4 (SOTOMAYOR, J., dissenting). But if customary international law does not require corporate liability, then

declining to create it under the ATS cannot give other nations just cause for complaint against the United States.

To the contrary, ATS suits against foreign corporations may provoke—and, indeed, frequently *have* provoked—exactly the sort of diplomatic strife inimical to the fundamental purpose of the ATS. Some foreign states appear to interpret international law as foreclosing civil corporate liability for violations of the law of nations. See Brief for Government of the United Kingdom et al. as *Amici Curiae* in *Kiobel* v. *Royal Dutch Petroleum Co.*, O. T. 2012, No. 10–1491, p. 14. Creating ATS causes of action against foreign corporate defendants would put the United States at odds with these nations. Even when states do not object to this sort of corporate liability as a *legal* matter, they may be concerned about ATS suits against their corporations for political reasons. For example, Jordan considers this suit "a direct affront" to its sovereignty and one that "risks destabilizing Jordan's economy and undercutting one of the most stable and productive alliances the United States has in the Middle East." Brief for Hashemite Kingdom of Jordan as *Amicus Curiae* 4. Courting these sorts of problems—which seem endemic to ATS litigation—was the opposite of what the First Congress had in mind.

In response, the dissent argues merely that any diplomatic friction "can be addressed with a tool more tailored to the source of the problem than a blanket ban on corporate liability." *Post*, at 19. Even on its own terms, that argument is problematic: Many of the "more tailored" tools offered by the dissent will still be hotly litigated by ATS plaintiffs, and it may be years before incorrect initial decisions about their applicability can be reviewed by the courts of appeals. See *ante*, at 11 (plurality opinion).

In any event, the dissent misunderstands the relevant standard. The question before us is whether the United States would be embroiled in fewer international contro-

versies if we created causes of action under the ATS against foreign corporate defendants. Unless corporate liability would actively *decrease* diplomatic disputes, we have no authority to act. On that score, the dissent can only speculate that declining to create causes of action against foreign corporate defendants "might" lead to diplomatic friction. *Post*, at 30. But the dissent has no real-world examples to support its hunch, and that is not surprising; the ATS already goes further than any other statute in the world in granting aliens the right to sue civilly for violations of international law, especially in light of the many other avenues for relief available. See *ante*, at 23 (plurality opinion). It would be rather rich for any other nation to complain that the ATS does not go far enough. Indeed, no country has.

Finally, the dissent invokes "the considered judgment of the Executive Branch and Congress" that ATS suits against foreign corporations are "necessary 'to help the United States avoid diplomatic friction.'" *Post*, at 31, n. 13. Tellingly, however, the dissent cannot muster a single source that actually supports that bold contention. Instead, the dissent immediately retreats to two far more modest assertions. First, the dissent observes that the Executive Branch has twice suggested that this Court should allow causes of action against corporate defendants under the ATS. But both times the Executive Branch defended that perspective primarily under the first step of *Sosa*; here, however, we are dealing with *Sosa*'s second step, and with the risk of diplomatic friction in particular. Second, the dissent also notes that the Executive Branch and Congress have each taken steps to hold corporations liable for certain acts like terrorism. *Post*, at 31, n. 13. That is, of course, true, but it is also entirely irrelevant. Congress and the Executive Branch may be willing to trade off the risk of some diplomatic friction in exchange for the promotion of other objectives (such as "holding

foreign corporations to account for certain egregious con-duct," *ibid.*). That is their prerogative as the political branches. But consistent with the separation of powers, we have neither the luxury nor the right to make such policy decisions ourselves.

Creating causes of action under the ATS against foreign corporate defendants would be a no-win proposition. Foreign corporate liability would not only fail to meaning-fully advance the objectives of the ATS, but it would also lead to precisely those "serious consequences in interna-tional affairs" that the ATS was enacted to avoid. *Sosa*, 542 U. S., at 715. Under those circumstances, federal courts have a duty to refrain from acting. Although that may make it more difficult for aliens to hold foreign corpo-rations liable for human rights abuses, we have repeatedly rejected the view that the ATS was meant to transform the federal courts into forums for the litigation of all hu-man rights suits. See *ante*, at 8–9, 25–27 (majority opin-ion); *Kiobel*, 569 U. S., at 123–124; *Sosa*, *supra*, at 715–718. Declining to extend the ATS to foreign corporate defendants is thus not about "[i]mmunizing corporations that violate human rights," *post*, at 34, but rather about furthering the purpose that the ATS was actually meant to serve—avoiding diplomatic strife.

# SUPREME COURT OF THE UNITED STATES

---

No. 16–499

---

## JOSEPH JESNER, ET AL., PETITIONERS *v.* ARAB BANK, PLC

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[April 24, 2018]

JUSTICE GORSUCH, concurring in part and concurring in the judgment.

I am pleased to join the Court's judgment and Parts I, II–B–1, and II–C of its opinion. Respectfully, though, I believe there are two more fundamental reasons why this lawsuit must be dismissed. A group of foreign plaintiffs wants a federal court to invent a new cause of action so they can sue another foreigner for allegedly breaching international norms. In any other context, a federal judge faced with a request like that would know exactly what to do with it: dismiss it out of hand. Not because the defendant happens to be a corporation instead of a human being. But because the job of creating new causes of action and navigating foreign policy disputes belongs to the political branches. For reasons passing understanding, federal courts have sometimes treated the Alien Tort Statute as a license to overlook these foundational principles. I would end ATS exceptionalism. We should refuse invitations to create new forms of legal liability. And we should not meddle in disputes between foreign citizens over international norms. I write because I am hopeful that courts in the future might pause to consider both of these reasons for restraint before taking up cases like this one. Whatever powers courts may possess in ATS suits, they are powers judges should be doubly careful not to abuse.

I

First adopted in 1789, the current version of the ATS provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U. S. C. §1350. More than two hundred years later, the meaning of this terse provision has still "proven elusive." *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, 719 (2004). At the same time, this Court has suggested that Congress enacted the statute to afford federal courts jurisdiction to hear tort claims related to three violations of international law that were already embodied in English common law: violations of safe conducts extended to aliens, interference with ambassadors, and piracy. *Id.*, at 715; 4 W. Blackstone, Commentaries on the Laws of England 68 (1769) (Blackstone); see also Bellia & Clark, The Alien Tort Statute and the Law of Nations, 78 U. Chi. L. Rev. 445 (2011) (arguing that the ATS meant to supply jurisdiction over a slightly larger set of claims involving intentional torts by Americans against aliens).

In this case, the plaintiffs seek much more. They want the federal courts to recognize a new cause of action, one that did not exist at the time of the statute's adoption, one that Congress has never authorized. While their request might appear inconsistent with *Sosa*'s explanation of the ATS's modest origin, the plaintiffs say that a caveat later in the opinion saves them. They point to a passage where the Court went on to suggest that the ATS may *also* afford federal judges "discretion [to] conside[r] [creating] new cause[s] of action" if they "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the [three] 18th-century" torts the Court already described. 542 U. S., at 725.

I harbor serious doubts about *Sosa*'s suggestion. In our

democracy the people's elected representatives make the laws that govern them. Judges do not. The Constitution's provisions insulating judges from political accountability may promote our ability to render impartial judgments in disputes between the people, but they do nothing to recommend us as policymakers for a large nation. Recognizing just this, our cases have held that when confronted with a request to fashion a new cause of action, "separation-of-powers principles are or should be central to the analysis." *Ziglar* v. *Abbasi*, 582 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 12). The first and most important question in that analysis "is 'who should decide' . . . , Congress or the courts?" and the right answer "most often will be Congress." *Ibid.* Deciding that, henceforth, persons like A who engage in certain conduct will be liable to persons like B is, in every meaningful sense, just like enacting a new law. And in our constitutional order the job of writing new laws belongs to Congress, not the courts. Adopting new causes of action may have been a "proper function for common-law courts," but it is not appropriate "for federal tribunals" mindful of the limits of their constitutional authority. *Alexander* v. *Sandoval*, 532 U. S. 275, 287 (2001) (internal quotation marks omitted).

Nor can I see any reason to make a special exception for the ATS. As *Sosa* initially acknowledged, the ATS was designed as "a jurisdictional statute creating no new causes of action." 542 U. S., at 724; accord, *ante,* at 8 (majority opinion). And I would have thought that the end of the matter. A statute that creates no new causes of action . . . creates no new causes of action. To the extent *Sosa* continued on to claim for federal judges the discretionary power to create new forms of liability on their own, it invaded terrain that belongs to the people's representatives and should be promptly returned to them. 542 U. S., at 747 (Scalia, J., concurring in part and concurring in

judgment).[1]

But even accepting *Sosa*'s framework does not end the matter. As the Court acknowledges, there is a strong argument that "a proper application of *Sosa* would preclude courts from ever recognizing any new causes of action under the ATS." *Ante,* at 19. I believe that argument is correct. For the reasons just described, separation of powers considerations ordinarily require us to defer to Congress in the creation of new forms of liability. This Court hasn't yet used *Sosa*'s assertion of discretionary authority to recognize a new cause of action, and I cannot imagine a sound reason, hundreds of years after the statute's passage, to start now. For a court inclined to claim the discretion to enter this field, it is a discretion best exercised by staying out of it.

The context in which any *Sosa* discretion would be exercised confirms the wisdom of restraint. *Sosa* acknowledged that any decision to create a new cause of action would "inevitably [involve] an element of judgment about the practical consequences" that might follow. *Id.,* at 732–733. But because the point of such a claim would be to vindicate "a norm of international character," *id.,* at 725, those "practical consequences" would likely involve questions of foreign affairs and national security—matters that implicate neither judicial expertise nor authority. It is for Congress to "define and punish . . . Offences against the

_____

[1] The dissent claims that Congress's decision to give federal courts "jurisdiction over claims based on 'the law of nations,'" necessarily implies the authority to develop that law. *Post*, at 16. That does not follow. Federal courts have *jurisdiction* over all kinds of cases—for example, those arising under the law of torts or contracts. Yet following our decision in *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938), federal courts are generally no longer permitted to promulgate new federal common law causes of action in those areas. *Id.*, at 75. I can see no reason to treat the law of nations differently. See *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, 744–746 (2004) (Scalia, J., concurring in part and concurring in judgment).

Law of Nations" and to regulate foreign commerce. U. S. Const., Art. I., §8. And it is for the President to resolve diplomatic disputes and command the armed forces. Art. II, §§2–3. Foreign policy and national security decisions are "delicate, complex, and involve large elements of prophecy" for which "the Judiciary has neither aptitude, facilities[,] nor responsibility." *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.*, 333 U. S. 103, 111 (1948) (Jackson, J.). And I find it difficult to imagine a case in which a federal court might safely conclude otherwise. Take this very lawsuit by way of example. The Kingdom of Jordan considers it to be "a 'grave affront' to its sovereignty," and the State Department worries about its foreign policy implications. *Ante,* at 26. Whether American interests justify the "practical consequence" of offending another nation in this way (or in worse ways yet) is a question that should be addressed "only by those directly responsible to the people whose welfare" such decisions "advance or imperil." *Waterman S. S. Corp.*, *supra,* at 111. So while I have no quarrel with the dissent's observation, *post,* at 15–16, that lower federal courts are not free to overrule *Sosa*'s framework or treat it as optional, I do know that the analysis *Sosa* requires should come out the same way in virtually every case. If *Sosa* is right—and I am sure it is—that federal courts must "inevitably" exercise "an element of judgment" about delicate questions of foreign affairs when deciding whether to create a new cause of action, then judges should exercise *good* judgment by declining the project before we create real trouble.

## II

Another independent problem lurks here. This is a suit by foreigners against a foreigner over the meaning of international norms. Respectfully, I do not think the original understanding of the ATS or our precedent per-

mits federal courts to hear cases like this. At a minimum, both those considerations and simple common sense about the limits of the judicial function should lead federal courts to require a domestic defendant before agreeing to exercise any *Sosa*-generated discretion to entertain an ATS suit.

Start with the statute. What we call the Alien Tort Statute began as just one clause among many in §9 of the Judiciary Act of 1789, which specified the jurisdiction of the federal courts. 1 Stat. 76–78. The ATS clause gave the district courts "cognizance, concurrent with the courts of the several States, or the circuit courts, as the case may be, of all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States."[2]    Like today's recodified version, 28 U. S. C.

---

[2] "Sec. 9. *And be it further enacted*, That the district courts shall have, exclusively of the courts of the several States, cognizance of all crimes and offences that shall be cognizable under the authority of the United States, committed within their respective districts, or upon the high seas; where no other punishment than whipping, not exceeding thirty stripes, a fine not exceeding one hundred dollars, or a term of imprisonment not exceeding six months, is to be inflicted; and shall also have exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, including all seizures under laws of impost, navigation or trade of the United States, where the seizures are made, on waters which are navigable from the sea by vessels of ten or more tons burthen, within their respective districts as well as upon the high seas; saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it; and shall also have exclusive original cognizance of all seizures on land, or other waters than as aforesaid, made, and of all suits for penalties and forfeitures incurred, under the laws of the United States. *And shall also have cognizance, concurrent with the courts of the several States, or the circuit courts, as the case may be, of all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States.* And shall also have cognizance, concurrent as last mentioned, of all suits at common law where the United States sue, and the matter in dispute amounts, exclusive of costs, to the sum or value of one hundred dollars. And shall also have jurisdiction, exclusively of the

§1350, the original text of the ATS did not expressly call for a U. S. defendant. But I think it likely would have been understood to contain such a requirement when adopted.

That is because the First Congress passed the Judiciary Act in the shadow of the Constitution. The Act created the federal courts and vested them with statutory authority to entertain claims consistent with the newly ratified terms of Article III. Meanwhile, under Article III, Congress could not have extended to federal courts the power to hear just any suit between two aliens (unless, for example, one was a diplomat). Diversity of citizenship was required. So, because Article III's diversity-of-citizenship clause calls for a U. S. party, and because the ATS clause requires an alien plaintiff, it follows that an American defendant was needed for an ATS suit to proceed.

Precedent confirms this conclusion. In *Mossman* v. *Higginson*, 4 Dall. 12, 14 (1800), this Court addressed the meaning of a neighboring provision of the Judiciary Act. Section 11 gave the circuit courts power to hear, among other things, civil cases where "an alien is a party." 1 Stat. 78. As with §9, you might think §11's language could be read to permit a suit *between* aliens. Yet this Court held §11 must instead be construed to refer only to cases "where, indeed, an alien is one party, but a citizen is the other." *Mossman*, 4 Dall., at 14 (internal quotation marks omitted). That was necessary, *Mossman* explained, to give the statute a "constructio[n] consistent" with the diversity-jurisdiction clause of Article III. *Ibid.* And as a matter of precedent, I cannot think of a good reason why we would now read §9 differently than *Mossman* read §11. Like

————————

courts of the several States, of all suits against consuls or vice-consuls, except for offences above the description aforesaid. And the trial of issues in fact, in the district courts, in all causes except civil causes of admiralty and maritime jurisdiction, shall be by jury." 1 Stat. 76–77 (some emphasis added; footnotes omitted).

cases are, after all, supposed to come out alike. See *Sarei* v. *Rio Tinto, PLC*, 671 F. 3d 736, 828 (CA9 2011) (Ikuta, J., dissenting) ("*Mossman*'s analysis [of §11] is equally applicable to [§9]. . . . ATS does not give federal courts jurisdiction to hear international law claims between two aliens"), vacated and remanded, 569 U. S. 945 (2013).

Nor does it appear the ATS meant to rely on any other head of Article III jurisdiction. You might wonder, for example, if the First Congress considered a "violation of the law of nations" to be a violation of, and thus "arise under," federal law. But that does not seem likely. At the founding, the law of nations was considered a distinct "system of rules, deducible by natural reason, and established by universal consent among the civilized inhabitants of the world," 4 Blackstone 66. While this Court has called international law "part of our law," *The Paquete Habana*, 175 U. S. 677, 700 (1900), and a component of the "law of the land," *The Nereide*, 9 Cranch 388, 423 (1815), that simply meant international law was no different than the law of torts or contracts—it was "part of the so-called general common law," but *not* part of federal law. *Sosa*, 542 U. S., at 739–740 (opinion of Scalia, J.). See Bradley & Goldsmith, Customary International Law as Federal Common Law: A Critique of the Modern Position, 110 Harv. L. Rev. 815, 824, 849–850 (1997); see also Young, Sorting Out the Debate Over Customary International Law, 42 Va. J. Int'l L. 365, 374–375 (2002). The text of the Constitution appears to recognize just this distinction. Article I speaks of "Offences against the Law of Nations," while both Article III and Article VI's Supremacy Clause, which defines the scope of pre-emptive federal law, omit that phrase while referring to the "Laws of the United States." Congress may act to bring provisions of international law into federal law, but they cannot find their way there on their own. "The law of nations is not embodied in any provision of the Constitution, nor in any treaty, act of

Congress, or any authority, or commission derived from the United States." *Caperton* v. *Bowyer*, 14 Wall. 216, 228 (1872).

Even so, that hardly left the ATS without important work to perform. At the time of the founding, "[i]f a nation failed to redress injuries by its citizens upon the citizens of another nation, the perpetrators' nation violated the 'perfect rights' of the other nation," which "provided the offended nation with just cause for reprisals or war." Bellia & Clark, 78 U. Chi. L. Rev., at 476.[3] This reality posed an existential threat to the new nation. Under the Articles of Confederation, States regularly refused to redress injuries their citizens caused foreigners. British creditors, for example, often found their efforts to collect debts from American debtors thwarted. *Id.*, at 498–501. Seeking to remedy these and similar problems, the Continental Congress in 1781 passed a resolution encouraging the States, among other things, to establish tribunals for vindicating "offences against the law of nations" and to "authorise suits to be instituted for damages by the party injured." *Id.,* at 495–496. But the States did too little, too late. So when the framers gathered to write the Constitution they included among their chief priorities endowing the national

———————

[3] As a leading treatise explained, a sovereign "ought not to suffer his subjects to molest the subjects of others, or to do them an injury, much less should he permit them audaciously to offend foreign powers." E. de Vattel, 1 The Law of Nations, bk. II, §76, p. 145 (1760). Instead, the nation "ought to oblige the guilty to repair the damage, if that be possible, to inflict on him an exemplary punishment, or, in short, according to the nature of the case, and the circumstances attending it, to deliver him up to the offended state there to receive justice." *Ibid.* A sovereign who "refuses to cause a reparation to be made of the damage caused by his subject, or to punish the guilty, or, in short, to deliver him up, renders himself in some measure an accomplice in the injury, and becomes responsible for it." *Id.*, §77, at 145; see also Bellia & Clark, The Alien Tort Statute and the Law of Nations, 78 U. Chi. L. Rev. 472–477 (2011).

government with sufficient power to ensure the country's
compliance with the law of nations. See 1 Records of the
Federal Convention of 1787, pp. 24–25 (M. Farrand rev.
1966).

Together with other provisions of the Judiciary Act, the
ATS served that purpose. The law of nations required
countries to ensure foreign citizens could obtain redress
for wrongs committed by domestic defendants, whether
"through criminal punishment, extradition, or a civil
remedy." Bellia & Clark, 78 U. Chi. L. Rev., at 509. Yet
in 1789 this country had no comprehensive criminal code
and no extradition treaty with Great Britain. *Id.,* at 509–
510. Section 11 achieved a partial solution to the problem
by permitting civil diversity suits in federal court between
aliens and domestic parties, but that provision required at
least $500 in controversy. 1 Stat. 78; cf. 28 U. S. C.
§1332(a) (today's minimum is $75,000). But, as Professors
Bellia and Clark have explained, "[h]ad Congress stopped
there, it would have omitted an important category of law
of nations violations that threatened the peace of the
United States: personal injuries that US citizens inflicted
upon aliens resulting in less than $500 in damages." 78 U.
Chi. L. Rev., at 509. So the ATS neatly filled the remain-
ing gap by allowing aliens to sue in federal court for a tort
in violation of the law of nations regardless of the amount
in controversy. One obvious advantage of this solution
"was that it was self-executing—it placed the burden on
injured aliens to bring suit and did not require the still-
forming US government immediately to marshal the
resources necessary to prosecute crimes" or aid extradi-
tions. *Id.,* at 510.

Any attempt to decipher a cryptic old statute is sure to
meet with challenges. For example, one could object that
this reading of the Act does not assign to the ATS the
work of addressing assaults by aliens against foreign
ambassadors on our soil, even though *Sosa* suggested the

statute was enacted partly in response to precisely such a case: the "Marbois incident of May 1784, in which a French adventurer, De Longchamps, verbally and physically assaulted the Secretary of the French Legion in Philadelphia." 542 U. S., at 716. Many thought that the States' failure to provide a forum for relief to the foreign minister was a scandal and part of what prompted the framers of the Constitution to strengthen the national government. *Id.,* at 717; Bellia & Clark, *supra,* at 467 ("The Confederation's inability to remedy or curtail violations like these was a significant factor precipitating the Federal Convention of 1787").

But worries along these lines may be misplaced. The ATS was never meant to serve as a freestanding statute, only as one clause in one section of the Judiciary Act. So even if you think *something* in the Judiciary Act must be interpreted to address the Marbois incident, that doesn't mean it must be the ATS clause. And, as it happens, a different provision of the Act *did* deal expressly with the problem of ambassadorial assaults: Section 13 conferred on this Court "original, but not exclusive jurisdiction of all suits brought by ambassadors, or other public ministers, or in which a consul, or vice consul shall be a party." 1 Stat. 80–81. That implemented Article III's provision empowering us to hear suits "affecting Ambassadors, other public ministers and Consuls." §2. And given that §13 deals with the problem of "ambassadors" so directly, it is unclear why we must read §9 to address that same problem. See Lee, The Safe-Conduct Theory of the Alien Tort Statute, 106 Colum. L. Rev. 830, 855–858 (2006).

Along different but similar lines, some might be concerned that requiring a U. S. defendant in ATS suits would leave the problem of piracy inadequately addressed, given that *Sosa* suggested that piracy was one of the three offenses the ATS may have meant to capture, and many pirates were foreigners. See 542 U. S., at 719. But here

the response is much the same. A separate clause of §9 gave the district courts "exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction." 1 Stat. 77. That statute has long been given a broad construction covering "all maritime contracts, torts and injuries," *DeLovio* v. *Boit*, 7 F. Cas. 418, 442 (No. 3,776) (CC Mass. 1815) (Story, J.), along with "prize jurisdiction, which probably included almost all 'piracy' cases after 1789," Lee, *supra,* at 867. So it is not clear why it's necessary to cram the problem of piracy into the ATS. If anything, it may be necessary *not* to do so. Structural features of §9 make it at least questionable that both provisions were meant to address the same subject matter: Cases falling within §9's ATS clause could also be brought in state court or in the circuit courts, 1 Stat. 77, while §9's admiralty jurisdiction was generally exclusive, *id.*, at 76–77. See Lee*, supra*, at 868. And the two provisions also called for incompatible procedures: Section 9 required jury trials "in all causes *except* civil causes of admiralty and maritime jurisdiction." 1 Stat. 77 (emphasis added).

If doubt lingers on these historical questions, it is a doubt that should counsel restraint all the same. Even if the ATS might have meant to allow foreign *ambassadors* to sue foreign defendants, or foreign plaintiffs to sue foreign *pirates*, what would that prove about more mine-run cases like ours, where none of those special concerns are implicated? There are at least serious historical arguments suggesting the ATS was not meant to apply to suits like this one. And to the extent *Sosa* affords courts discretion to proceed, these arguments should inform any decision whether to exercise that discretion. In *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. 108, 116–117 (2013), the Court invoked *Sosa* discretion to refuse to hear cases involving foreign conduct. I can see no reason why courts should respond differently when it comes to cases involv-

ing foreign defendants.[4]

Any consideration of *Sosa*'s discretion must also account for proper limits on the judicial function. As discussed above, federal courts generally lack the institutional expertise and constitutional authority to oversee foreign policy and national security, and should be wary of straying where they do not belong. See *supra,* at 4–5. Yet there are degrees of institutional incompetence and constitutional evil. It is one thing for courts to assume the task of creating new causes of action to ensure *our* citizens abide by the law of nations and *avoid* reprisals against this country. It is altogether another thing for courts to punish *foreign* parties for conduct that could not be attributed to the United States and thereby *risk* reprisals against this country. If a foreign state or citizen violates an "international norm" in a way that offends another foreign state or citizen, the Constitution arms the President and Congress with ample means to address it. Or, if they think best, the political branches may choose to look the other way. But in all events, the decision to impose sanctions in disputes between foreigners over international

——————

[4] The dissent is wrong to suggest, *post,* at 17, that *Sosa* "forecloses" the possibility of recognizing a U. S.-defendant requirement in ATS cases. *Sosa* said nothing about the subject. And were *Sosa* taken to preclude any future limits on ATS suits it did not itself anticipate, then *Kiobel* must have been wrong to apply the canon against extraterritorial application to that statute. But that is not so. The dissent also observes that *Sosa* "involved an ATS suit brought by a citizen of Mexico against a citizen of Mexico," and that certain *amici* in *Sosa* filed briefs arguing that the Court lacked authority over the ATS claims for that reason. See *post,* at 17. But *Sosa* did not address those arguments; questions that "merely lurk in the record are not resolved, and no resolution of them may be inferred." *Illinois Bd. of Elections* v. *Socialist Workers Party*, 440 U. S. 173, 183 (1979) (citations and internal quotation marks omitted); accord, *RJR Nabisco, Inc.* v. *European Community*, 579 U. S. \_\_\_, \_\_\_, n. 10 (2016) (slip op., at 23, n. 10) (issue present but unaddressed by the Court in a previous case was not implicitly decided).

norms is not ours to make.  It is a decision that belongs to
those answerable to the people and assigned by the Con-
stitution to defend this nation.  If they wish our help, they
are free to enlist it, but we should not ever be in the busi-
ness of elbowing our way in.

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–499
_____

### JOSEPH JESNER, ET AL., PETITIONERS *v.* ARAB BANK, PLC

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[April 24, 2018]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG, JUSTICE BREYER, and JUSTICE KAGAN join, dissenting.

The Court today holds that the Alien Tort Statute (ATS), 28 U. S. C. §1350, categorically forecloses foreign corporate liability. In so doing, it absolves corporations from responsibility under the ATS for conscience-shocking behavior. I disagree both with the Court's conclusion and its analytic approach. The text, history, and purpose of the ATS, as well as the long and consistent history of corporate liability in tort, confirm that tort claims for law-of-nations violations may be brought against corporations under the ATS. Nothing about the corporate form in itself raises foreign-policy concerns that require the Court, as a matter of common-law discretion, to immunize all foreign corporations from liability under the ATS, regardless of the specific law-of-nations violations alleged. I respectfully dissent.

I

The plurality assumes without deciding that whether corporations can be permissible defendants under the ATS turns on the first step of the two-part inquiry set out in *Sosa* v. *Alvarez-Machain*, 542 U. S. 692 (2004). But by asking whether there is "a specific, universal, and obligatory norm of liability for corporations" in international

law, *ante,* at 13, the plurality fundamentally misconceives how international law works and so misapplies the first step of *Sosa.*

## A

In *Sosa*, the Court considered whether a Mexican citizen could recover under the ATS for a claim of arbitrary detention by a Mexican national who had been hired by the Drug Enforcement Administration to seize and transport him to the United States. See 542 U. S., at 697–698. The Court held that the ATS permits federal courts to "recognize private causes of action for certain torts in violation of the law of nations," *id.,* at 724, without the need for any "further congressional action," *id.,* at 712. The Court then articulated a two-step framework to guide that inquiry. First, a court must determine whether the particular international-law norm alleged to have been violated is "accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms," *i.e.,* "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Id.,* at 724–725. Only if the norm is "'specific, universal, and obligatory'" may federal courts recognize a cause of action for its violation. *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. 108, 117 (2013) (quoting *Sosa*, 542 U. S., at 732). Second, if that threshold hurdle is satisfied, a court should consider whether allowing a particular case to proceed is an appropriate exercise of judicial discretion. *Sosa*, 542 U. S., at 727–728, 732–733, 738. Applying that framework, *Sosa* held that the alleged arbitrary detention claim at issue failed at step one because "a single illegal detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment, violates no norm of customary international law so well defined as to support the creation of a federal remedy." *Id.,* at 738.

*Sosa*'s norm-specific first step is inapposite to the cate-

gorical question whether corporations may be sued under the ATS as a general matter. International law imposes certain obligations that are intended to govern the behavior of states and private actors. See *id.,* at 714–715; 1 Restatement (Third) of Foreign Relations Law of the United States, pt. II, Introductory Note, pp. 70–71 (1987) (Restatement). Among those obligations are substantive prohibitions on certain conduct thought to violate human rights, such as genocide, slavery, extrajudicial killing, and torture. See 2 Restatement §702. Substantive prohibitions like these are the norms at which *Sosa*'s step-one inquiry is aimed and for which *Sosa* requires that there be sufficient international consensus.

*Sosa* does not, however, demand that there be sufficient international consensus with regard to the mechanisms of enforcing these norms, for enforcement is not a question with which customary international law is concerned. Although international law determines what substantive conduct violates the law of nations, it leaves the specific rules of how to enforce international-law norms and remedy their violation to states, which may act to impose liability collectively through treaties or independently via their domestic legal systems. See, *e.g.,* L. Henkin, Foreign Affairs and the United States Constitution 245 (2d ed. 1996) ("International law itself . . . does not require any particular reaction to violations of law"); Denza, The Relationship Between International and National Law, in International Law 423 (M. Evans ed. 2006) ("[I]nternational law does not itself prescribe how it should be applied or enforced at the national level"); 1 Restatement §111, Comment *h* ("In the absence of special agreement, it is ordinarily for the United States to decide how it will carry out its international obligations"); Brief for International Law Scholars as *Amici Curiae* 9–10.

In keeping with the nature of international law, *Sosa* consistently used the word "norm" to refer to substantive

conduct. For example, *Sosa* commands that "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when §1350 was enacted." 542 U. S., at 732. That statement would make little sense if "norm" encompassed enforcement mechanisms like "corporate liability." Unlike "the prohibition on genocide," "corporate liability" cannot be violated. Moreover, "the historical paradigms familiar when §1350 was enacted" are all prohibitions on conduct, and *Sosa* clearly contemplated that courts should compare the charged conduct with the historical conduct. See *ibid.* (quoting *Filartiga* v. *Pena-Irala*, 630 F. 2d 876 (1980), where the Court of Appeals for the Second Circuit compared a "'torturer'" to "'the pirate and slave trader before him,'" *id.*, at 890, and Judge Edwards' concurrence in *Tel-Oren* v. *Libyan Arab Republic*, 726 F. 2d 774 (CADC 1984), which suggested that the "'limits of section 1350's reach'" be defined by "'a handful of heinous actions—each of which violates definable, universal and obligatory norms,'" *id.,* at 781). There is no indication in *Sosa* that the Court also intended for courts to undertake the apples-to-oranges comparison of the conduct proscribed under customary international law and the forms of liability available under domestic law.

The text of the ATS also reflects this distinction between prohibiting conduct and determining enforcement. The statute provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U. S. C. §1350. The phrase "of the law of nations" modifies "violation," not "civil action." The statutory text thus requires only that the alleged conduct be specifically and universally condemned under international law, not that the civil action be of a type that the

international community specifically and universally practices or endorses.

## B

## 1

The plurality nonetheless allies itself with the view that international law supplies the rule of decision in this case based on its reading of footnote 20 in *Sosa*. That footnote sets out "[a] related consideration" to "the determination whether a norm is sufficiently definite to support a cause of action." 542 U. S., at 732, and n. 20. In full, it states:

> "A related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual. Compare *Tel-Oren* v. *Libyan Arab Republic*, 726 F. 2d 774, 791–795 (CADC 1984) (Edwards, J., concurring) (insufficient consensus in 1984 that torture by private actors violates international law), with *Kadic* v. *Karadžić*, 70 F. 3d 232, 239–241 (CA2 1995) (sufficient consensus in 1995 that genocide by private actors violates international law)." 542 U. S., at 732, n. 20.

In the Second Circuit's decision in *Kiobel* v. *Royal Dutch Petroleum*, 621 F. 3d 111 (2010), the majority opinion read footnote 20 to "requir[e] that [courts] look to *international law* to determine [their] jurisdiction over ATS claims against a particular class of defendant, such as corporations." *Id.,* at 127 (emphasis in original). The plurality today accords "considerable force and weight to [that] position," *ante,* at 13, and so proceeds to assess whether there exists a specific, universal, and obligatory norm of liability for corporations in international law, *ante,* at 13–17. But the Court of Appeals mistook the meaning of footnote 20, which simply draws attention to the fact that,

under international law, "the distinction between conduct
that does and conduct that does not violate the law of
nations can turn on whether the conduct is done by or on
behalf of a State or by a private actor independently of a
State." *Kiobel*, 621 F. 3d, at 177 (Leval, J., concurring in
judgment).

The international-law norm against genocide, for exam-
ple, imposes obligations on all actors. Acts of genocide
thus violate the norm irrespective of whether they are
committed privately or in concert with the state. See
Convention on the Prevention and Punishment of the
Crime of Genocide, Art. II, Dec. 9, 1948, 102 Stat. 3045
(defining "genocide" as "any of the following acts commit-
ted with intent to destroy, in whole or in part, a national,
ethnical, racial or religious group"); see also 18 U. S. C.
§1091(a) ("Whoever" commits genocide "shall be punished
as provided in subsection (b)"). In contrast, other norms,
like the prohibition on torture, require state action. Con-
duct thus qualifies as torture and violates the norm only
when done "by or at the instigation of or with the consent
or acquiescence of a public official or other person acting
in an official capacity." Convention Against Torture and
Other Cruel, Inhuman or Degrading Treatment or Pun-
ishment, Art. 1, Dec. 10, 1984, S. Treaty Doc. No. 100–20,
1465 U. N. T. S. 114 (Torture Convention).[1]

Footnote 20 in *Sosa* flags this distinction and instructs
courts to consider whether there is "sufficient consensus"
that, with respect to the particular conduct prohibited
under "a given norm," the type of defendant being sued
can be alleged to have violated that specific norm. 542
U. S., at 732, n. 20. Because footnote 20 contemplates a

———————

[1] This distinction is similar to the state-action doctrine in domestic
law. The prohibitions in the Bill of Rights, for instance, apply only to
state actors, whereas the Thirteenth Amendment's prohibition on
slavery applies to all actors, state and private. See *United States* v.
*Kozminski*, 487 U. S. 931, 942 (1988).

norm-specific inquiry, not a categorical one, it is irrelevant
to the categorical question presented here. Assuming the
prohibition against financing of terrorism is sufficiently
"specific, universal, and obligatory" to satisfy the first step
of *Sosa*, a question on which I would remand to the Court
of Appeals, nothing in international law suggests a corpo-
ration may not violate it.[2]

_____

[2] At present, the norm-specific query contemplated by footnote 20 is
likely resolved simply by considering whether the given international-
law norm binds only state actors or state and nonstate actors alike,
because there does not appear to be an international-law norm that
contemplates a finer distinction between types of private actors. See
Brief for United States as *Amicus Curiae* in *Kiobel* v. *Royal Dutch
Petroleum Co.*, O. T. 2012, No. 10–1491, p. 20 ("At the present time, the
United States is not aware of any international-law norm, accepted by
civilized nations and defined with the degree of specificity required by
*Sosa*, that requires, or necessarily contemplates, a distinction between
natural and juridical actors"); Dodge, Corporate Liability Under Cus-
tomary International Law, 43 Geo. J. Int'l L. 1045, 1050 (2012) ("None
of the norms that are actionable under *Sosa* distinguish between
natural and juridical persons").

*Sosa* itself supports the proposition that international law does not
distinguish between types of private actors, but rather treats natural
persons and corporations alike. Footnote 20 groups corporations and
individuals together under the larger category of "private actor." *Sosa*,
542 U. S., at 732, n. 20 ("if the defendant is a private actor such as a
corporation or an individual"); see also *id.*, at 760 (BREYER, J., concur-
ring in part and concurring in judgment) ("The norm must extend
liability to the type of perpetrator (*e.g.*, a private actor) the plaintiff
seeks to sue" (citing *id.*, at 732, n. 20)). *Sosa* also describes the two
Court of Appeals decisions on which it relies as having considered
whether there was sufficient consensus that particular conduct—
torture or genocide—"violates international law" when undertaken "by
private actors." *Id.*, at 732, n. 20 (discussing *Tel-Oren* v. *Libyan Arab
Republic*, 726 F. 2d 774, 791–795 (CADC 1984) (Edwards, J., concur-
ring), and *Kadic* v. *Karadžić*, 70 F. 3d 232, 239–241 (CA2 1995)). Even
though the defendant in *Kadic* was a natural person, see *id.*, at 237,
and the defendants in *Tel-Oren* were juridical entities, see 726 F. 2d, at
775–776, *Sosa* refers to them all as "private actors," 542 U. S., at 732,
n. 20.

2

The plurality briefly acknowledges this critique of its reading of footnote 20, but nonetheless assumes the correctness of its approach because of its view that there exists a "distinction in international law between corporations and natural persons." *Ante,* at 17. The plurality attempts to substantiate this proposition by pointing to the charters of certain international criminal tribunals and noting that none was given jurisdiction over corporate defendants. That argument, however, confuses the substance of international law with how it has been enforced in particular contexts.

Again, the question of who must undertake the prohibited conduct for there to be a violation of an international-law norm is one of international law, but how a particular actor is held liable for a given law-of-nations violation generally is a question of enforcement left up to individual states. Sometimes, states act collectively and establish international tribunals to punish certain international-law violations. Each such tribunal is individually negotiated, and the limitations placed on its jurisdiction are typically driven by strategic considerations and resource constraints.

For example, the Allies elected not to prosecute corporations at Nuremberg because of pragmatic factors. Those factors included scarce judicial resources, a preference of the occupation governments to swiftly dismantle the most culpable German companies without destroying Germany's postwar economy, and a desire to focus on establishing the principle of nonstate criminal responsibility for human-rights violations. See Brief for Nuremberg Scholars as *Amici Curiae* 4, 11–13.

More recently, the delegations that negotiated the Rome Statute of the International Criminal Court in the 1990's elected not to extend that tribunal's jurisdiction to corporations in part because states had varying domestic prac-

tices as to whether and how to impose criminal liability on corporations. See Frulli, Jurisdiction *Ratione Personae*, in 1 Rome Statute of the International Criminal Court 527, 532–533 (A. Cassese et al. eds. 2002); Brief for Ambassador David J. Scheffer as *Amicus Curiae* 8–10.

Taken to its natural conclusion, the plurality's focus on the practice of international criminal tribunals would prove too much. No international tribunal has been created and endowed with the jurisdiction to hold natural persons civilly (as opposed to criminally) liable, yet the majority and respondent accept that natural persons can be held liable under the ATS. See *ante,* at 26; Tr. of Oral Arg. 62. It cannot be persuasive evidence for purposes of ascertaining the availability of corporate civil liability under the ATS, then, that the jurisdiction of the handful of international criminal tribunals that states have seen fit to create in the last 75 years has not extended to corporate defendants.

Ultimately, the evidence on which the plurality relies does not prove that international law distinguishes between corporations and natural persons as a categorical matter. To the contrary, it proves only that states' collective efforts to enforce various international-law norms have, to date, often focused on natural rather than corporate defendants.

In fact, careful review of states' collective and individual enforcement efforts makes clear that corporations are subject to certain obligations under international law. For instance, the United States Military Tribunal that prosecuted several corporate executives of IG Farben declared that corporations could violate international law. See 8 Trials of War Criminals Before the Nuernberg Military Tribunals Under Council Control Law No. 10, p. 1132 (1952) ("Where private individuals, including juristic persons, proceed to exploit the military occupancy by acquiring private property against the will and consent of

the former owner, such action . . . is in violation of interna-
tional law").[3]  Similarly, the International Criminal Tri-
bunal for Rwanda found that three nonnatural entities—a
private radio station, newspaper, and political party—
were responsible for genocide.  See *Prosecutor* v. *Nahimana*,
Case No. ICTR–99–52–T, Judgment and Sentence ¶953
(Dec. 3, 2003).  Most recently, the appeals panel of the
Special Tribunal for Lebanon held that corporations may
be prosecuted for contempt.  See *Prosecutor* v. *New TV
S. A. L.,* Case No. STL–14–05/PT/AP/AR126.1, Decision on
Interlocutory Appeal Concerning Personal Jurisdiction in
Contempt Proceedings ¶74 (Oct. 2, 2014).

In addition, various international agreements require
signatory states to impose liability on corporations for
certain conduct.[4]  Of particular relevance here, the Inter-
national Convention for the Suppression of the Financing
of Terrorism provides: "Any person commits an offence
within the meaning of this Convention if that person by
any means, directly or indirectly, unlawfully and wilfully,
provides or collects funds with the intention that they
should be used or in the knowledge that they are to be
used, in full or in part, in order to carry out" an act of

―――――――

[3] The Nuremberg Tribunal also was empowered to adjudicate a form
of criminal organizational liability, pursuant to which an individual
member of a convicted organization would face a rebuttable presump-
tion of guilt in a subsequent proceeding.  Brief for Nuremberg Scholars
as *Amici Curiae* 4, 20–21 (citing Agreement for the Prosecution and
Punishment of the Major War Criminals of the European Axis, Aug. 8,
1945, Arts. 9–10, 59 Stat. 1544, E. A. S. No. 472; see also Brief for
Nuremberg Scholars 21–22 (citing *United States* v. *Goering*, 22 Trial of
the Major War Criminals Before the International Military Tribunal
171, 505, 511, 516–517 (Int'l Mil. Trib. 1946) (declaring three organiza-
tions criminal)).

[4] See, *e.g.,* United Nations Convention Against Transnational Orga-
nized Crime, Art. 10(1), Nov. 15, 2000, T. I. A. S. No. 13127, S. Treaty
Doc. No. 108–16; Convention on Combating Bribery of Foreign Public
Officials in International Business Transactions, Art. 2, Dec. 17, 1997,
2802 U. N. T. S. 230.

terrorism. Dec. 9, 1999, Art. 2, S. Treaty Doc. No. 106–49, 2178 U. N. T. S. 230. It then requires each signatory state, "in accordance with its domestic legal principles," to "take the necessary measures to enable a legal entity located in its territory or organized under its laws to be held liable when a person responsible for the management or control of that legal entity has, in that capacity," violated the Convention. *Id.*, Art. 5(1). The Convention provides that "[s]uch liability may be criminal, civil, or administrative," *ibid.*, so long as the penalties, which can include monetary sanctions, are "effective, proportionate and dissuasive." *Id.,* Art. 5(3). The United States is a party to the Convention, along with 131 other states.[5]

The plurality dismisses the relevance of this Convention because it does not require states parties to hold corporations liable in common-law tort actions, but rather permits them to "fulfill their obligations . . . by adopting detailed regulatory regimes governing financial institutions." *Ante,* at 16. That critique misses the point. The significance of the Convention is that the international community agreed that financing terrorism is unacceptable conduct and that such conduct violates the Convention when undertaken by corporations. That the Convention leaves up to each state party how to impose liability on corporations, *e.g.,* via erecting a regulatory regime, providing for tort actions, or imposing criminal sanctions, is unremarkable,[6] and simply reflects that international law sets out stand-

————————
[5] See International Convention for the Suppression of the Financing of Terrorism, online at https://treaties.un.org/doc/Publication/MTDSG/ Volume%20II/Chapter%20XVIII/XVIII-11.en.pdf (all Internet materials as last visited Apr. 16, 2018).

[6] The Genocide Convention also does not specifically require that states parties recognize tort claims for genocide, but federal courts have long permitted such actions under the ATS as a matter of federal common law. See, *e.g., Kadic*, 70 F. 3d, at 236. The same is true of the Torture Convention. See, *e.g., Filartiga* v. *Pena-Irala,* 630 F. 2d 876, 885 (CA2 1980).

ards of conduct and leaves it to individual states to determine how best to enforce those standards.

Finally, a number of states, acting individually, have imposed criminal and civil liability on corporations for law-of-nations violations through their domestic legal systems. See, *e.g., New TV S. A. L.*, Case No. STL–14–05/PT/AP/AR126.1, ¶¶52–55 (listing more than 40 countries that provide for corporate criminal liability); A. Ramasastry & R. Thompson, Commerce, Crime and Conflict: Legal Remedies for Private Sector Liability for Grave Breaches of International Law 22–24 (2006), available at https://www.biicl.org/files/4364_536.pdf (noting that 15 of 16 countries surveyed permit civil claims against corporations for human rights violations); Brief for Comparative Law Scholars and Practitioners as *Amici Curiae* 15–19 (detailing provisions creating corporate civil liability for international-law violations in England, France, the Netherlands, and Canada).

C

Instead of asking whether there exists a specific, universal, and obligatory norm of corporate liability under international law, the relevant inquiry in response to the question presented here is whether there is any reason—under either international law or our domestic law—to distinguish between a corporation and a natural person who is alleged to have violated the law of nations under the ATS. As explained above, international law provides no such reason. See *Kiobel*, 621 F. 3d, at 175 (Leval, J., concurring in judgment) ("[T]he answer international law furnishes is that it takes no position on the question"). Nor does domestic law. The text, history, and purpose of the ATS plainly support the conclusion that corporations may be held liable.

Beginning "with the language of the statute itself," *United States* v. *Ron Pair Enterprises, Inc.*, 489 U. S. 235,

241 (1989), two aspects of the text of the ATS make clear that the statute allows corporate liability. First, the text confers jurisdiction on federal district courts to hear "civil action[s]" for "tort[s]." 28 U. S. C. §1350. Where Congress uses a term of art like tort, "it presumably knows and adopts the cluster of ideas that were attached to [the] borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." *Morissette* v. *United States*, 342 U. S. 246, 263 (1952).

Corporations have long been held liable in tort under the federal common law. See *Philadelphia, W., & B. R. Co.* v. *Quigley*, 21 How. 202, 210 (1859) ("At a very early period, it was decided in Great Britain, as well as in the United States, that actions might be maintained against corporations for torts; and instances may be found, in the judicial annals of both countries, of suits for torts arising from the acts of their agents, of nearly every variety"); *Chestnut Hill & Spring House Turnpike Co.* v. *Rutter*, 4 Serg. & Rawle 6, 17 (Pa. 1818) ("[F]rom the earliest times to the present, corporations have been held liable for torts"). This Court "has assumed that, when Congress creates a tort action, it legislates against a legal background of ordinary tort-related . . . rules and consequently intends its legislation to incorporate those rules." *Meyer* v. *Holley*, 537 U. S. 280, 285 (2003). The presumption, then, is that, in providing for "tort" liability, the ATS provides for corporate liability.

Second, whereas the ATS expressly limits the class of permissible plaintiffs to "alien[s]," §1350, it "does not distinguish among classes of defendants," *Argentine Republic* v. *Amerada Hess Shipping Corp.*, 488 U. S. 428, 438 (1989). That silence as to defendants cannot be presumed to be inadvertent. That is because in the same section of the Judiciary Act of 1789 as what is now the ATS, Congress provided the federal district courts with jurisdiction

over "all suits against consuls or vice-consuls." §9, 1 Stat.
76–77.   Where Congress wanted to limit the range of
permissible defendants, then, it clearly knew how to do so.
*Russello* v. *United States*, 464 U. S. 16, 23 (1983) ("[W]here
Congress includes particular language in one section of a
statute but omits it in another section of the same Act, it
is generally presumed that Congress acts intentionally
and purposely in the disparate inclusion or exclusion"
(internal quotation marks omitted)).

   Nothing about the historical background against which
the ATS was enacted rebuts the presumption that the
statute incorporated the accepted principle of corporate
liability for tortious conduct.   Under the Articles of Con-
federation, the Continental Congress was unable to pro-
vide redress to foreign citizens for violations of treaties or
the law of nations, which threatened to undermine the
United States' relationships with other nations.   See
*Kiobel*, 569 U. S., at 123.   The First Congress responded
with, *inter alia*, the ATS.   Although the two incidents that
highlighted the need to provide foreign citizens with a
federal forum in which to pursue their grievances involved
conflicts between natural persons, see *ante,* at 7 (majority
opinion) (describing the assault by a French adventurer on
the Secretary of the French Legation and the arrest of one
of the Dutch Ambassador's servants by a New York con-
stable), there is "no reason to conclude that the First
Congress was supremely concerned with the risk that
natural persons would cause the United States to be
drawn into foreign entanglements, but was content to
allow formal legal associations of individuals, i.e., corpora-
tions, to do so," *Doe* v. *Exxon Mobil Corp.*, 654 F. 3d 11, 47
(CADC 2011), vacated on other grounds, 527 Fed. Appx. 7
(CADC 2013); see also Brief for United States as *Amicus
Curiae* 6 ("The ATS was enacted to ensure a private dam-
ages remedy for incidents with the potential for serious
diplomatic consequences, and Congress had no good rea-

son to limit the set of possible defendants in such actions to potentially judgment-proof individuals"). Indeed, fore-closing corporations from liability under the ATS would have been at odds with the contemporaneous practice of imposing liability for piracy on ships, juridical entities. See, *e.g., Skinner* v. *East India Co.*, 6 State Trials 710, 711 (1666); *The Marianna Flora*, 11 Wheat. 1, 40–41 (1826); *Harmony* v. *United States*, 2 How. 210, 233 (1844).

Finally, the conclusion that corporations may be held liable under the ATS for violations of the law of nations is not of recent vintage. More than a century ago, the Attor-ney General acknowledged that corporations could be held liable under the ATS. See 26 Op. Atty. Gen. 250, 252 (1907) (stating that citizens of Mexico could bring a claim under the ATS against a corporation, the American Rio Grande Land and Irrigation Company, for violating provi-sions of a treaty between the United States and Mexico).

## D

In his concurrence, JUSTICE GORSUCH urges courts to exercise restraint in recognizing causes of action under the ATS. But whether the ATS provides a cause of action for violations of the norms against genocide, crimes against humanity, and financing of terrorism is not the question the parties have asked the Court to decide. I therefore see no reason why it is necessary to delve into the propriety of creating new causes of action. Nevertheless, because I disagree with the premises on which the concurrence relies, I offer two brief observations.

First, JUSTICE GORSUCH says it "pass[es] understand-ing" why federal courts have exercised jurisdiction over ATS claims raised by foreign plaintiffs against foreign defendants for breaches of international norms. See *ante,* at 1 (opinion concurring in part and concurring in judg-ment). Modern ATS cases, however, are not being litigated against a blank slate. The Court held in *Sosa* that Con-

gress authorized the federal courts to "recognize private causes of action for certain torts in violation of the law of nations," 542 U. S., at 724, so long as the underlying norm had no "less definite content and acceptance among civilized nations than the historical paradigms familiar when §1350 was enacted," *id.,* at 732. That holding was no mere "suggestion," *ante,* at 2 (opinion of GORSUCH, J.), as this Court has made clear. See *Kiobel*, 569 U. S., at 116–117.

Given that the First Congress authorized suit for violations based on "the law of nations" and "treat[ies] of the United States," 28 U. S. C. §1350, it is natural to conclude that Congress intended the district courts to consider new claims under the law of nations as that law and our Nation's treaty obligations continued to develop. If Congress intended to limit such cases to violations of safe conduct, assaults against ambassadors, piracy, and—as JUSTICE GORSUCH suggests may have been the case—"'personal injuries that US citizens inflicted upon aliens resulting in less than $500 in damages,'" *ante*, at 10 (quoting Bellia & Clark, The Alien Tort Statute and the Law of Nations, 78 U. Chi. L. Rev. 445, 509 (2011)), it easily could have said so. Instead, it granted the federal courts jurisdiction over claims based on "the law of nations," a body of law that Congress did not understand to be static. See *United States* v. *The La Jeune Eugenie*, 26 F. Cas. 832, 846 (No. 15,551) (CC Mass. 1822) (Story, J.) ("What, therefore, the law of nations is . . . may be considered as modified by practice, or ascertained by the treaties of nations at different periods. It does not follow . . . that because a principle cannot be found settled by the consent or practice of nations at one time, it is to be concluded, that at no subsequent period the principle can be considered as incorporated into the public code of nations").

The question for courts considering new ATS claims is, "Who are today's pirates?" *Kiobel*, 569 U. S., at 129 (BREYER, J., concurring in judgment). Torturers and those

who commit genocide are now fairly viewed, like pirates, as "common enemies of all mankind." *Id.,* at 131 (internal quotation marks omitted). On remand, the Court of Appeals would decide whether the financiers of terrorism are the same. The fact that few norms have overcome *Sosa*'s high hurdle is strong evidence that the carefully considered standard set forth in that case is generating exactly the kind of "judicial caution" the Court stressed as necessary. See 542 U. S., at 725.

Second, the concurrence suggests that federal courts may lack jurisdiction to entertain suits between aliens based solely on a violation of the law of nations. It contends that ATS suits between aliens fall under neither the federal courts' diversity jurisdiction nor our federal question jurisdiction. The Court was not unaware of this argument when it decided *Sosa*. As noted, that case involved an ATS suit brought by a citizen of Mexico against a citizen of Mexico, and various *amici* argued that the Court lacked Article III jurisdiction over such suits. See Brief for National Foreign Trade Counsel et al. as *Amici Curiae* in *Sosa* v. *Alvarez-Machain*, O. T. 2003, No. 03–339, pp. 24–25; see also Brief for Washington Legal Foundation et al. as *Amici Curiae* in No. 03–339, pp. 14–21. The Court nonetheless proceeded to decide the case, which it could not have done had it been concerned about its Article III power to do so. See *Arbaugh* v. *Y & H Corp.*, 546 U. S. 500, 514 (2006). That decision forecloses the argument the concurrence now makes, as *Sosa* authorized courts to "recognize private claims *under federal common law* for violations of" certain international law norms. 542 U. S., at 732 (emphasis added); see also *id.*, at 729–730 (explaining that, post-*Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938), there are "limited enclaves in which federal courts may derive from substantive law in a common law way," including the law of nations, and that "it would be unreasonable to assume that the First Congress would

have expected federal courts to lose all capacity to recognize enforceable international norms simply because the common law might lose some metaphysical cachet on the road to modern realism"); *Sarei* v. *Rio Tinto*, 671 F. 3d 736, 749–754 (CA9 2011) (en banc) (discussing *Sosa* and concluding that federal courts have Article III jurisdiction to hear ATS cases between aliens), vacated and remanded, 569 U. S. 945 (2013) (remanding for further consideration in light of *Kiobel*).

  *Sosa* was correct as a legal matter. Moreover, our Nation has an interest not only in providing a remedy when our own citizens commit law of nations violations, but also in preventing our Nation from serving as a safe harbor for today's pirates. See *Kiobel*, 569 U. S., at 133–134 (BREYER, J., concurring in judgment). To that end, Congress has ratified treaties requiring the United States "to punish or extradite offenders, even when the offense was not committed . . . by a national." 1 Restatement §404, Reporters' Note 1, at 255–257; see Torture Convention, Arts. 5, 7; Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents, Art. 3, Dec. 14, 1973, 28 U. S. T. 1975, T. I. A. S. No. 8532; Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, Sept. 23, 1971, 24 U. S. T. 565, T. I. A. S. No. 7570; Convention for the Suppression of Unlawful Seizure of Aircraft, Art. 4, Dec. 16, 1970, 22 U. S. T. 1641, T. I. A. S. No. 7192; Geneva Convention Relative to the Treatment of Prisoners of War, Art. 129, Aug. 12, 1949, 6 U. S. T. 3316, T. I. A. S. No. 3364. To the extent suits against foreign defendants may lead to international friction, that concern is better addressed under the presumption the Court established in *Kiobel* against extraterritorial application of the ATS, see 569 U. S., at 124–125, than it is by relitigating settled precedent.

II

At its second step, *Sosa* cautions that courts should consider whether permitting a case to proceed is an appropriate exercise of judicial discretion in light of potential foreign-policy implications. See 542 U. S., at 727–728, 732–733, 738. The plurality only assumes without deciding that international law does not impose liability on corporations, so it necessarily proceeds to *Sosa*'s second step. Here, too, its analysis is flawed.

A

Nothing about the corporate form in itself justifies categorically foreclosing corporate liability in all ATS actions. Each source of diplomatic friction that respondent Arab Bank and the plurality identify can be addressed with a tool more tailored to the source of the problem than a blanket ban on corporate liability.

Arab Bank contends that foreign citizens should not be able "to sue a Jordanian corporation in New York for events taking place in the Middle East." Brief for Respondent 42. The heart of that qualm was already addressed in *Kiobel*, which held that the presumption against extraterritoriality applies to the ATS. 569 U. S., at 124. Only where the claims "touch and concern the territory of the United States . . . with sufficient force" can the presumption be displaced. *Id.,* at 124–125. "[M]ere corporate presence" does not suffice. *Id.,* at 125. Thus, contrary to the majority's contention, "the relatively minor connection between the terrorist attacks at issue in this case and the alleged conduct in the United States" does not "well illustrat[e] the perils of extending the scope of ATS liability to foreign multinational corporations," *ante,* at 25, but merely illustrates the risks of extending the scope of ATS liability extraterritorially absent sufficient connection to the United States.

Arab Bank also bemoans the unfairness of being sued

when others—namely, the individuals and organizations that carried out the terrorist attacks—were "the direct cause" of the harm petitioners here suffered.  Brief for Respondent 41.  That complaint, though, is a critique of the imposition of liability for financing terrorism, not an argument that ATS suits against corporations generally necessarily cause diplomatic tensions.

Arab Bank further expresses concern that ATS suits are being filed against corporations in an effort to recover for the bad acts of foreign governments or officials.  See *id.*, at 40.  But the Bank's explanation of this problem reveals that the true source of its grievance is the availability of aiding and abetting liability.  See *ibid.* ("[N]umerous ATS suits have alleged that a corporation has aided or abetted bad acts committed by a *foreign government and its officials*" (emphasis in original)); *id.,* at 41 ("[A]iding and abetting suits under the ATS have given plaintiffs 'a clear means for effectively circumventing' critical limits on foreign sovereign immunity" (quoting Brief for United States as *Amicus Curiae* in *American Isuzu Motors, Inc.* v. *Ntsebeza*, O. T. 2007, No. 07–919, p. 15)).  The plurality too points to an aiding and abetting case to support its contention that plaintiffs "use corporations as surrogate defendants to challenge the conduct of foreign governments."  *Ante,* at 21 (discussing *Kiobel*, in which plaintiffs sought to hold a corporate defendant liable for "'aiding and abetting the Nigerian Government in committing'" law-of-nations violations (quoting 569 U. S., at 114)).  Yet not all law-of-nations violations asserted against corporations are premised on aiding and abetting liability; it is possible for a corporation to violate international-law norms independent of a foreign state or foreign state officials.  In this respect, too, the Court's rule is ill fitted to the problem identified.

Notably, even the Hashemite Kingdom of Jordan does not argue that there are foreign-policy tensions inherent

in suing a corporation generally. Instead, Jordan contends that this particular suit is an affront to its sovereignty because of its extraterritorial character and because of the role that Arab Bank specifically plays in the Jordanian economy. See Brief for Hashemite Kingdom of Jordan as *Amicus Curiae* 6–12.[7]

The majority also cites to instances in which other foreign sovereigns have "appeared in this Court to note [their] objections to ATS litigation," *ante,* at 26, but none of those objections was about the availability of corporate liability as a general matter. See *Sosa*, 542 U. S., at 733, n. 21 (noting argument of the European Commission that "basic principles of international law require that before asserting a claim in a foreign forum, the claimant must have exhausted any remedies available in the domestic legal system, and perhaps in other forums such as international claims tribunals"); *ibid.* (noting objections by South Africa to "several class actions seeking damages from various corporations alleged to have participated in, or abetted, the regime of apartheid" on the basis that the cases "interfere[d] with the policy embodied by its Truth and Reconciliation Commission"); Brief for Federal Republic of Germany as *Amicus Curiae* in *Kiobel* v. *Royal Dutch Petroleum Co.*, O. T. 2012, No. 10–1491, p. 1 ("The Federal Republic of Germany has consistently maintained its opposition to overly broad assertions of extraterritorial civil jurisdiction arising out of aliens' claims against foreign defendants for alleged foreign activities that caused injury on foreign soil"); Brief for Government of the United

_____

[7] Jordan does argue that corporate liability is unavailable under the ATS, but that argument is based on its view that there is no universally recognized international-law norm of corporate liability, see Brief for Hashemite Kingdom of Jordan as *Amicus Curiae* 12–15, not a contention that corporate status alone presents foreign-policy concerns justifying immunity for all corporations in all ATS suits irrespective of circumstance.

Kingdom of Great Britain and Northern Ireland et al. as *Amici Curiae* in No. 10–1491, p. 3 ("The Governments remain deeply concerned about . . . suits by foreign plaintiffs against foreign defendants for conduct that entirely took place in the territory of a foreign sovereign").

As the United States urged at oral argument, when international friction arises, a court should respond with the doctrine that speaks directly to the friction's source. See Tr. of Oral. Arg. 28 (acknowledging that "ATS litigation in recent decades has raised international friction" and explaining that "the way to deal with that friction is with a doctrine that speaks directly to the international entanglement . . . as those questions arise"). In addition to the presumption against extraterritoriality, federal courts have at their disposal a number of tools to address any foreign-relations concerns that an ATS case may raise. This Court has held that a federal court may exercise personal jurisdiction over a foreign corporate defendant only if the corporation is incorporated in the United States, has its principal place of business or is otherwise at home here, or if the activities giving rise to the lawsuit occurred or had their impact here. See *Daimler AG* v. *Bauman*, 571 U. S. 117 (2014). Courts also can dismiss ATS suits for a plaintiff's failure to exhaust the remedies available in her domestic forum, on *forum non conveniens* grounds, for reasons of international comity, or when asked to do so by the State Department. See *Kiobel*, 569 U. S., at 133 (BREYER, J., concurring in judgment); *Sosa*, 542 U. S., at 733, n. 21.

Several of these doctrines might be implicated in this case, and I would remand for the Second Circuit to address them in the first instance.[8] The majority, however,

---

[8] For instance, the alleged conduct might not sufficiently touch and concern the United States to displace the presumption against extraterritoriality; the prohibition on terrorism financing might not be a

prefers to use a sledgehammer to crack a nut. I see no need for such an ill-fitting and disproportionate response. Foreclosing foreign corporate liability in all ATS actions, irrespective of circumstance or norm, is simply too broad a response to case-specific concerns that can be addressed via other means.[9]

## B

### 1

The Court urges that "[t]he political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns." *Ante,* at 19. I agree that the political branches are well poised to assess the foreign-policy concerns attending ATS litigation, which is why I give significant weight to the fact that the Executive Branch, in briefs signed by the Solicitor General and State Department Legal Advisor, has twice urged the Court to reach exactly the opposite conclusion of the one embraced by the majority. See Brief for United States as *Amicus Curiae* 5 ("This Court should vacate the decision below, which rests on the mistaken premise that a federal common-law claim under the ATS may never be brought against a corporation"); Brief for United States as *Amicus Curiae* in *Kiobel* v. *Royal Dutch Petroleum Co.*, O. T. 2012, No. 10–1491, p. 7 ("Courts may recognize corporate liability in actions under the ATS as a matter of federal common

———————

specific, universal, and obligatory norm warranting recognition under the ATS; and petitioners might not be able to prove the requisite *mens rea*. In addition, petitioners have asserted direct, rather than vicarious, liability against respondent. A suit based on only vicarious liability may raise different questions not presented here.

[9] The majority's overly blunt rule is also unlikely to resolve any foreign-relations concerns at play in this case. Arab Bank is still being sued under the Antiterrorism Act of 1990 for the exact same conduct as alleged here. It is also hard to imagine that Jordan would have been perfectly content to see the CEO of Arab Bank and high-level officials at the New York branch sued under the ATS.

law. . . . *Sosa*'s cautionary admonitions provide no reason to depart from the common law on this issue"). At oral argument in this case, the United States told the Court that it saw no "sound reason to categorically exclude corporate liability." Tr. of Oral Arg. 29. It explained that another country would hold the United States accountable for not providing a remedy against a corporate defendant in a "classic" ATS case, such as one involving a "foreign officia[l] injured in the United States," *id.*, at 32–33, and suggested that foreclosing the ability to recover from a corporation actually would raise "the possibility of friction," *id.,* at 33. Notably, the Government's position that categorically barring corporate liability under the ATS is wrong has been consistent across two administrations led by Presidents of different political parties.

Likewise, when Members of Congress have weighed in on the question whether corporations can be proper defendants in an ATS suit, it has been to advise the Court against the rule it now adopts. See Brief for Sen. Sheldon Whitehouse et al. as *Amici Curiae* 7–11; Brief for Former Sen. Arlen Specter et al. as *Amici Curiae* in *Kiobel* v. *Royal Dutch Petroleum Co.*, O. T. 2012, No. 10–1491, pp. 17–18. Congress has also never seen it necessary to immunize corporations from ATS liability even though corporations have been named as defendants in ATS suits for years. See *Monessen Southwestern R. Co.* v. *Morgan*, 486 U. S. 330, 338 (1988) ("Congress' failure to disturb a consistent judicial interpretation of a statute may provide some indication that 'Congress at least acquiesces in, and apparently affirms, that [interpretation]'" (quoting *Cannon* v. *University of Chicago*, 441 U. S. 677, 703 (1979))).

Given the deference to the political branches that *Sosa* encourages, I find it puzzling that the Court so eagerly departs from the express assessment of the Executive Branch and Members of Congress that corporations can be

defendants in ATS actions.

2

The plurality instead purports to defer to Congress by relying heavily on the Torture Victim Protection Act of 1991 (TVPA), 106 Stat. 73, note following 28 U. S. C. §1350, to support its categorical bar. See *ante,* at 20. The TVPA makes available to all individuals, not just foreign citizens, a civil cause of action for torture and extrajudicial killing that may be brought against natural persons. See *Mohamad* v. *Palestinian Authority*, 566 U. S. 449, 451–452, 454 (2012). The plurality extrapolates from Congress' decision regarding the scope of liability under the TVPA a rule that it contends should govern all ATS suits. See *ante,* at 20. But there is no reason to think that because Congress saw fit to permit suits only against natural persons for two specific law-of-nations violations, Congress meant to foreclose corporate liability for all law-of-nations violations. The plurality's contrary conclusion ignores the critical textual differences between the ATS and TVPA, as well as the TVPA's legislative history, which emphasizes Congress' intent to leave the ATS undisturbed.

On its face, the TVPA is different from the ATS in several significant ways: It is focused on only two law-of-nations violations, torture and extrajudicial killing; it makes a cause of action available to all individuals, not just foreign citizens; and it uses the word "individual" to delineate who may be liable. See 28 U. S. C. §1350 note. The ATS, by contrast, is concerned with all law-of-nations violations generally, makes a cause of action available only to foreign citizens, and is silent as to who may be liable. Because of the textual differences between the two statutes, the Court unanimously concluded in *Mohamad* that the ATS "offers no comparative value" in ascertaining the scope of liability under the TVPA. 566 U. S., at 458. It makes little sense, then, to conclude that the TVPA has

dispositive comparative value in discerning the scope of liability under the ATS.

Furthermore, Congress repeatedly emphasized in the House and Senate Reports on the TVPA that the statute was meant to supplement the ATS, not replace or cabin it. See H. R. Rep. No. 102–367, pt. 1, p. 3 (1991) ("Section 1350 has other important uses and should not be replaced. There should also, however, be a clear and specific remedy, not limited to aliens, for torture and extrajudicial killing"); *id.,* at 4 ("The TVPA . . . would also enhance the remedy already available under section 1350 in an important respect: While the [ATS] provides a remedy to aliens only, the TVPA would extend a civil remedy also to U. S. citizens who may have been tortured abroad"); *ibid.* ("[C]laims based on torture or summary executions do not exhaust the list of actions that may appropriately be covered b[y] section 1350. That statute should remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary international law"); S. Rep. No. 102–249, pp. 4–5 (1991); see also *Sosa*, 542 U. S., at 731 (explaining that the TVPA "supplement[ed] the judicial determination" in *Filartiga*).

Lacking any affirmative evidence that Congress' decision to limit liability under the TVPA to natural persons indicates a legislative judgment about the proper scope of liability in all ATS suits, the plurality focuses its efforts on dismissing petitioners' argument that Congress limited TVPA liability to natural persons to harmonize the statute with the Foreign Sovereign Immunities Act of 1976 (FSIA), which generally immunizes foreign states from suit. See *ante,* at 21.[10] Contrary to the plurality's conten-

_____

[10] The TVPA requires state action to trigger liability. See 28 U. S. C. §1350 note (imposing liability on "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation" subjects an individual to torture or extrajudicial killing). Absent a limitation on suits against states and state entities, the TVPA arguably would have

tion, however, this Court did not reject petitioners' account of the TVPA's legislative history in *Mohamad*. In fact, that decision agreed that the legislative history "clarifi[es] that the Act does not encompass liability against foreign states." 566 U. S., at 459. What *Mohamad* rejected was the argument that because the TVPA forecloses liability against foreign states, it necessarily permits liability against corporations. In concluding that the TVPA encompasses only natural persons, *Mohamad* took no position on why Congress excluded organizations from its reach.[11]

To infer from the TVPA that no corporation may ever be held liable under the ATS for any violation of any international-law norm, moreover, ignores that Congress has elsewhere imposed liability on corporations for conduct prohibited by customary international law. For instance, the Antiterrorism Act of 1990 (ATA) created a civil cause of action for U. S. nationals injured by an act of international terrorism and expressly provides for corporate liability. 18 U. S. C. §2333. That Congress foreclosed corporate liability for torture and extrajudicial killing claims under the TVPA but permitted corporate liability for terrorism-related claims under the ATA is strong evidence that Congress exercises its judgment as to the appropriateness of corporate liability on a norm-by-norm basis, and that courts should do the same when considering whether to permit causes of action against corpora-

——————

been in conflict with the FSIA.

[11] Petitioners may be right that Congress limited liability under the TVPA to natural persons to harmonize the statute with the FSIA. That Congress thought it necessary to achieve that goal by foreclosing liability against all organizational defendants, not just those operating under the authority of a foreign government, might indicate that Congress thought such line drawing would be difficult, or that an expansive approach was the cleanest way to avoid the statute becoming a backdoor to suits against foreign governments.

tions for law-of-nations violations under the ATS.

The plurality dismisses the ATA as "an inapt analogy" because the ATA "provides a cause of action only to 'national[s] of the United States,'" whereas the ATS "provides a remedy for foreign nationals only." *Ante,* at 22 (quoting 18 U. S. C. §2333(a)). But if encompassing different groups of plaintiffs is what makes two statutes poor comparators for each other, the TVPA, too, is an inapt analogy, for it permits suits by all individuals, U. S. and foreign nationals alike.

The plurality also posits that the ATA "suggests that there should be no common-law action under the ATS for allegations like petitioners'," *ante,* at 22, because permitting such suits would allow foreign plaintiffs to "bypass Congress' express limitations on liability under the [ATA] simply by bringing an ATS lawsuit," *ibid.* Yet an ATS suit alleging terrorism-related conduct does not "bypass" or "displace" any "statutory and regulatory structure," *ibid.*, any more than an ATA suit does. As this case demonstrates, U. S. nationals and foreign citizens may bring ATA and ATS suits in the same court, at the same time, for the same underlying conduct. To the extent the plurality is suggesting that Congress, in enacting the ATA, meant to foreclose ATS suits based on terrorism financing, the plurality offers no evidence to support that hypothesis, and the legislative history suggests that Congress enacted the ATA to provide U. S. citizens with the same remedy already available to foreign citizens under the ATS. See Hearing on S. 2465 before the Subcommittee on Courts and Administrative Practice of the Senate Committee on the Judiciary, 101st Cong., 1st Sess., 90 (1990) (testimony of Joseph A. Morris) (noting that ATS actions for terrorism "would be preserved").

At bottom, the ATS and TVPA are related but distinct statutes that coexist independently. There is no basis to conclude that the considered judgment Congress made

about who should be liable under the TVPA for torture and extrajudicial killing should restrict who can be held liable under the ATS for other law-of-nations violations, particularly where Congress made a different judgment about the scope of liability under the ATA for terrorism.

C

Finally, the plurality offers a set of "[o]ther considerations relevant to the exercise of judicial discretion" that it concludes "counsel against allowing liability under the ATS for foreign corporations." *Ante,* at 23. None is persuasive.

First, the plurality asserts that "[i]t has not been shown that corporate liability under the ATS is essential to serve the goals of the statute" because "the ATS will seldom be the only way for plaintiffs to hold the perpetrators liable," and because "plaintiffs still can sue the individual corporate employees responsible for a violation of international law under the ATS." *Ibid.* This Court has never previously required that, to maintain an ATS action, a plaintiff must show that the ATS is the exclusive means by which to hold the alleged perpetrator liable and that no relief can be had from other parties. Such requirements extend far beyond the inquiry *Sosa* contemplated and are without any basis in the statutory text.

Moreover, even if there are other grounds on which a suit alleging conduct constituting a law-of-nations violation can be brought, such as a state-law tort claim, the First Congress created the ATS because it wanted foreign plaintiffs to be able to bring their claims in federal court and sue for law-of-nations violations. A suit for state-law battery, even if based on the same alleged conduct, is not the equivalent of a federal suit for torture; the latter contributes to the uptake of international human rights

norms, and the former does not.[12]

Furthermore, holding corporations accountable for violating the human rights of foreign citizens when those violations touch and concern the United States may well be necessary to avoid the international tension with which the First Congress was concerned. Consider again the assault on the Secretary of the French Legation in Philadelphia by a French adventurer. See *supra,* at 14; *ante,* at 7 (majority opinion). Would the diplomatic strife that followed really have been any less charged if a corporation had sent its agent to accost the Secretary? Or, consider piracy. If a corporation owned a fleet of vessels and directed them to seize other ships in U. S. waters, there no doubt would be calls to hold the corporation to account. See *Kiobel*, 621 F. 3d, at 156, and n. 10 (observing that "Somali pirates essentially operate as limited partnerships"). Finally, take, for example, a corporation posing as a job-placement agency that actually traffics in persons, forcibly transporting foreign nationals to the United States for exploitation and profiting from their abuse. Not only are the individual employees of that business less likely to be able fully to compensate successful ATS plaintiffs, but holding only individual employees liable does not impose accountability for the institution-wide disregard for human rights. Absent a corporate sanction, that harm will persist unremedied. Immunizing the corporation from suit under the ATS merely because it is a corporation, even though the violations stemmed directly from corporate policy and practice, might cause serious diplomatic

––––––––

[12] Counsel for Arab Bank acknowledged the symbolic force of ATS liability at oral argument. See Tr. of Oral Arg. 60 ("[T]he idea of the ATS is . . . not just that you violated a statute, but that you have violated some specific universal obligatory norm so you are essentially an enemy of mankind. So, as much as my clients would not like to be an ATA defendant, they would really, really, really not like to be . . . labeled an enemy of mankind").

friction.[13]

Second, the plurality expresses concern that if foreign corporations are subject to liability under the ATS, other nations could hale American corporations into court and subject them "to an immediate, constant risk of claims seeking to impose massive liability for the alleged conduct

———————

[13] JUSTICE ALITO, adopting a more absolutist position than the plurality, asserts without qualification that "federal courts should not create causes of action under the ATS against foreign corporate defendants" because doing so "would precipitate . . . diplomatic strife." *Ante,* at 1, 4 (opinion concurring in part and concurring in judgment). The conclusion that ATS suits against foreign corporate defendants for law-of-nations and treaty violations always will cause diplomatic friction, and that such suits will never be necessary "to help the United States avoid diplomatic friction," *ante,* at 4, however, is at odds with the considered judgment of the Executive Branch and Congress regarding the importance of holding foreign corporations to account for certain egregious conduct. As noted, see Part II–B–1, *supra,* the Executive Branch has twice urged the Court not to foreclose the ability of foreign nationals to sue foreign corporate defendants under the ATS. The United States also has ratified several international agreements that require it to impose liability on corporations, both foreign and domestic, for certain actions, including the financing of terrorism. See *supra,* at 10–11. Congress, too, has expressly authorized civil suits against corporations for acts related to terrorism. See 18 U. S. C. §2333. The Executive Branch and Congress surely would not have taken these positions, entered into these obligations, or made available these causes of action if the result were intolerable diplomatic strife.

JUSTICE ALITO also faults the lack of "real-world examples" of instances in which diplomatic friction has resulted from a court's refusal to permit an individual to bring an ATS suit against a foreign corporation solely because of the defendant's status as a foreign juridical entity. *Ante,* at 6. Such refusals, though, have been rare, as no other Court of Appeals besides the Second Circuit that has considered the question has imposed a bar on corporate liability. Compare *Doe* v. *Drummond Co.*, 782 F. 3d 576, 584 (CA11 2015); *Doe I* v. *Nestle USA, Inc.*, 766 F. 3d 1013, 1022 (CA9 2014); *Doe* v. *Exxon Mobil Corp.*, 654 F. 3d 11, 39–57 (CADC 2011), vacated on other grounds, 527 Fed. Appx. 7 (CADC 2013); *Flomo* v. *Firestone Nat. Rubber Co.*, 643 F. 3d 1013, 1017–1021 (CA7 2011), with *Kiobel* v. *Royal Dutch Petroleum*, 621 F. 3d 111, 120 (CA2 2010).

of their employees and subsidiaries around the world," a prospect that will deter American corporations from investing in developing economies. *Ante,* at 24. The plurality offers no empirical evidence to support these alarmist conjectures, which is especially telling given that plaintiffs have been filing ATS suits against foreign corporations in United States courts for years. It does cite to an *amicus* brief for the United States in *American Isuzu Motors, Inc.* v. *Ntsebeza*, see *ante,* at 24, but that case was concerned with the availability of civil aiding and abetting liability, not corporate liability generally, and the United States never contended that permitting corporate liability under the ATS would undermine global investment. Instead, it argued that permitting extraterritorial aiding and abetting cases would interfere with foreign relations and deter "the free flow of trade and investment." See Brief for United States as *Amicus Curiae*, O. T. 2007, No. 07–919, pp. 12–16, 20. Driven by hypothetical worry about besieged American corporations, today's decision needlessly goes much further, encompassing all ATS suits against all foreign corporations, not just those cases with extraterritorial dimensions premised on an aiding and abetting theory.

\* \* \*

In sum, international law establishes what conduct violates the law of nations, and specifies whether, to constitute a law-of-nations violation, the alleged conduct must be undertaken by a particular type of actor. But it is federal common law that determines whether corporations may, as a general matter, be held liable in tort for law-of-nations violations. Applying that framework here, I would hold that the ATS does not categorically foreclose corporate liability. Tort actions against corporations have long been available under federal common law. Whatever the majority might think of the value of modern-day ATS

litigation, it has identified nothing to support its conclusion that "foreign corporate defendants create unique problems" that necessitate a categorical rule barring all foreign corporate liability. *Ante,* at 26.

Absent any reason to believe that the corporate form in itself raises serious foreign-policy concerns, and given the repeated urging from the Executive Branch and Members of Congress that the Court need not and should not foreclose corporate liability, I would reverse the decision of the Court of Appeals for the Second Circuit and remand for further proceedings, including whether the allegations here sufficiently touch and concern the United States, see *Kiobel*, 569 U. S., at 124–125, and whether the international-law norms alleged to have been violated by Arab Bank— the prohibitions on genocide, crimes against humanity, and financing of terrorism—are of sufficiently definite content and universal acceptance to give rise to a cause of action under the ATS.

## III

In categorically barring all suits against foreign corporations under the ATS, the Court ensures that foreign corporations—entities capable of wrongdoing under our domestic law—remain immune from liability for human rights abuses, however egregious they may be.

Corporations can be and often are a force for innovation and growth. Many of their contributions to society should be celebrated. But the unique power that corporations wield can be used both for good and for bad. Just as corporations can increase the capacity for production, so, too, some can increase the capacity for suffering. Consider the genocide that took upwards of 800,000 lives in Rwanda in 1994, which was fueled by incendiary rhetoric delivered via a private radio station, the Radio Télévision Libre des Mille Collines (RTLM). Men spoke the hateful words, but

the RTLM made their widespread influence possible.[14]

There can be, and sometimes is, a profit motive for these types of abuses. Although the market does not price all externalities, the law does. We recognize as much when we permit a civil suit to proceed against a paint company that long knew its product contained lead yet continued to sell it to families, or against an oil company that failed to undertake the requisite safety checks on a pipeline that subsequently burst. There is no reason why a different approach should obtain in the human rights context.

Immunizing corporations that violate human rights from liability under the ATS undermines the system of accountability for law-of-nations violations that the First Congress endeavored to impose. It allows these entities to take advantage of the significant benefits of the corporate form and enjoy fundamental rights, see, *e.g., Citizens United* v. *Federal Election Comm'n*, 558 U. S. 310 (2010); *Burwell* v. *Hobby Lobby Stores, Inc.*, 573 U. S. ___ (2014), without having to shoulder attendant fundamental responsibilities.

I respectfully dissent.

---

[14] See, *e.g., Nahimana* v. *Prosecutor*, Case No. ICTR 99–52–A, Appeals Judgment ¶176 (Nov. 28, 2007) (upholding finding that the RTLM Collines broadcasts "contributed substantially to the killing of Tutsi"); G. Prunier, The Rwanda Crisis: History of a Genocide 224 (2d ed. 1999) (detailing incitements to murder broadcast on the RTLM, including: "'The graves are not yet full. Who is going to do the good work and help us fill them completely'"); Yanagizawa-Drott, Propaganda and Conflict: Evidence From the Rwandan Genocide, 129 Q. J. Econ. 1947, 1950 (2014) (analyzing village-level data from Rwanda to estimate that the RTLM's transmissions caused 10 percent of the total participation in the genocide).